**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Jerry W. Jones, Jr., | ) | |
|   11202 Old Ironside Court | ) | |
|   Ft. Washington, MD 20744, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|       v. | ) | Civ. Action No. _____ |
| | ) | |
| JULIAN CASTRO, | ) | |
|   Secretary of Housing and | ) | |
|   Urban Development, | ) | |
|   451 Seventh Street, S.W. | ) | |
|   Washington, DC 20410, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Preliminary Statement

1.)     Plaintiff Jerry W. Jones, Jr., is an African American male who, from February of 2005 until the actions that comprise the subject matter of this Complaint, was the Director of Alternative Dispute Resolution (ADR) in the Office of Departmental Equal Employment Opportunity (ODEEO) of the U.S. Department of Housing and Urban Development (HUD).

2.)     Dr. Jones' duties as the GS-15 supervisory Director of ADR included managing the alternative dispute resolution program of HUD's entire EEO complaints process; serving as Department-wide Ombudsman for all EEO matters, often at the request of the Secretary of HUD and other senior agency officials; and mediating multi-party union disputes and labor management disputes for HUD nation-wide.

3.)     The record of Dr. Jones' conduct while undertaking these high level assignments and in the performance of all of his duties was superior and unblemished.

4.)     In July of 2009, Dr. Jones was attending an EEO conference in New Orleans, Louisiana, where he met Denise Banks, an unemployed EEO specialist.

5.)     In April of 2010, and without any knowledge on Dr. Jones' part, Ms. Banks began working as a complaints intake counselor at HUD ODEEO.

6.)     Two months after starting, in June of 2010, Ms. Banks falsely reported to senior HUD management that Dr. Jones sexually assaulted her during the conference before she was employed by HUD.  Ms. Banks spread her allegations in one or more highly charged sessions with ODEEO management and other HUD officials, and in contacts with the New Orleans Police Department (NOPD) and the HUD Office of the Inspector General (OIG).  Ms. Banks had no evidence corroborating her allegations and sexually charged text messages Ms. Banks sent to Dr. Jones showed that he made no unwelcome advances toward Ms. Banks.  Their relationship was limited to one consensual sexual encounter.

7.)     On June 16, 2010, before conducting an inquiry of any sort, ODEEO management had Dr. Jones removed from HUD premises under armed guard, placed on administrative leave with pay, and referred for investigation to HUD OIG.  Dr. Jones was removed from HUD premises without being provided an opportunity to refute the false allegations stated against him, nor being told what they were.

8.)     Dr. Jones remained on administrative leave for 20 months when, and despite being cleared of all charges involving Ms. Banks, he was suspended for five days without pay and reassigned out of his career field to a nonsupervisory position with no defined duties, subsequently placed in an acting position for seventeen months, and then permanently reassigned to a non-supervisory management/program analyst position.

9.)     Dr. Jones was given the opportunity to reply to HUD's charges for the first of three times on January 31, 2011.  In writing and in his two oral reply sessions, Dr. Jones proved that HUD's charges were groundless, that several could not possibly have been true, that exculpatory witnesses were never contacted, and that he was being discriminated against.

10.)    No later than June of 2011, HUD determined that the charges against Dr. Jones did not provide a sufficient basis for his removal and was ready to restore him to the workplace.

11.)    Nonetheless, HUD continued to keep Dr. Jones on administrative leave and then, on October 3, 2011, renewed the process of proposing to terminate him.

12.)    In short order, HUD again determined that Dr. Jones's alleged misconduct did not warrant termination and that he had to be returned to active duty.

13.)    Knowing that it would be unlawful to terminate Dr. Jones, in November and December of 2011, HUD tried to coerce Dr. Jones into resigning by knowingly giving Dr. Jones false information that he would lose all of his 38 years of accumulated retirement benefits if he was fired.  Only through repeated efforts on the part of Dr. Jones was he able to determine that the information provided by HUD was false and to resist HUD's attempt to coerce him into retiring.  HUD officials suggested that only by retiring could Dr. Jones be completely cleared of any wrong doing.

14.)    This case seeks redress for defendant's discrimination against Dr. Jones because he is an African American male, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16.  It also challenges defendant's retaliation against Dr. Jones for engaging in protected EEO activity.  By way of relief, plaintiff

seeks:  a.) declaratory and injunctive relief; b.) restoration to a position equivalent to the HUD ODEEO Director of ADR and Ombudsman; c.) backpay and commensurate benefits for the period of his suspension; d.) annual leave and cash bonuses and outstanding ratings that he lost as a result of being on administrative leave; e.) record correction; f.) compensatory damages; and g.) an award of attorneys' fees and costs.

## Parties, Jurisdiction, And Venue

15.)    Plaintiff Dr. Jerry W. Jones, Jr., was, until the actions of defendant that gave rise to this Complaint, the Director of defendant's agency-wide Alternative Dispute Resolution program, a supervisory GS-15 position.  Dr. Jones is an African American male who engaged in protected EEO activity and resides at the address recited in the caption of this Complaint.

16.)    Defendant Julian Castro is the Secretary of Housing and Urban Development, the Cabinet official who heads HUD, and is sued in his official capacity only.  HUD is a department in the Executive Branch of the federal government, the mission of which is to provide and encourage the provision of moderate and low income housing in the United States.

17.)    Jurisdiction of this Court is based upon 28 U.S.C. §1332; and 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000e-5(c)).  Venue lies here pursuant to 42 U.S.C. §2000e-16 (incorporating by reference 42 U.S.C. §2000-5(f)(3)), because the actions of defendant at issue were taken by defendant's management from their duty stations in this judicial district, where plaintiff is and would be employed.

## Statement Of Facts

## Background

18.)     Plaintiff Dr. Jerry W. Jones, Jr., served as the Director of the Alternative Dispute Resolution (ADR) program of the Department of Housing and Urban Development (HUD) beginning in February of 2005 until his suspension and unlawful reassignment out of that position.

19.)     Dr. Jones' last three appraisals before being removed from that position unlawfully were at the Outstanding level.  Dr. Jones received the Secretary's Award for heading the HUD ADR program, and an award from the Attorney General of the United States for his leadership role in the government-wide effort to promote ADR.  Dr. Jones was the driving force behind HUD's establishment of an agency-wide Conflict Resolution Board, violence in the workplace program, Ombudsman's Program, and Climate Assessment program.

20.)     Before joining HUD, Dr. Jones had an exceptionally successful career with the federal government spanning close to 40 years, starting with the U.S. Bureau of Engraving and Printing where his performance was regularly rated as Outstanding.  Dr. Jones received that agency's Abraham Lincoln Award for community and government service.  He has been an Adjunct Professor of the University of the District of Columbia and an external reviewer for the D.C. Department of Mental Health.

21.)     Dr. Jones' duties as Director of the HUD ADR program included heading the alternative dispute resolution program located within the Office of Departmental Equal Employment Opportunity (ODEEO), conducting training in ADR and mediation throughout HUD nationwide, and appearing as a senior representative in professional

conferences at HUD.  Dr. Jones also served as the agency Ombudsman on call as directed by the Secretary of HUD to assist in resolving especially complex disputes at the agency, including regional labor-management disputes and highly sensitive EEO issues.  Shortly before Dr. Jones was ousted from his position, he was called upon by the Secretary of HUD to facilitate the resolution of broad and systemic allegations of race discrimination, ethics violations, and abuse of authority lodged by a diverse group of attorneys in the Office of General Counsel.

22.)     Dr. Jones was also routinely called upon by federal agencies other than HUD to conduct training for their EEO counselors and specialists.  For example, at the time Dr. Jones was placed on administrative leave, he was scheduled to facilitate a conference and meet with the Director of the Office of Personnel Management (OPM), senior OPM officials, and the National President of AFGE as part of President Obama's initiative on federal labor management relations.  Dr. Jones was also scheduled to conduct national training for the Department of Health and Human Services EEO staff.

23.)     Dr. Jones is an ordained minister.  He holds a doctoral degree in Theology, is a Minister in Servants for Christ Ministries, is on constant call for his church for pastoral care, and serves as a source of spiritual guidance and strength for members of his congregation and upon request by non-members.

### Dr. Jones' "Introduction" to Denise Postell-Banks

24.)     Dr. Jones <u>never</u> had any disciplinary action taken against him, or even initiated for that matter, before the actions that underlie this Complaint.  He worked with hundreds if not thousands of women who are colleagues, EEO complainants, and members of Federally Employed Women.  Dr. Jones worked closely and regularly

traveled with female Discrimination Complaints Managers at HUD, union leaders, and senior agency officials in matters including conflict resolution in multi-party and often volatile labor-management disputes. Women who were or have been prominent in the federal government including at HUD came forward to support Dr. Jones in writing and refute the charges against him during the removal reply process.

25.)    Between July 27 and July 30, 2009, Dr. Jones attended a conference called Examining Conflicts in Employment Laws (the Excel EEO Conference) in New Orleans, Louisiana.

26.)    On the second day of the Excel EEO Conference, Dr. Jones met Denise Postell-Banks, then an unemployed EEO specialist. After the Excel EEO Conference concluded for the day, the two went to dinner and later a drink. As the evening wore on, Ms. Banks placed a condom in Dr. Jones' hand.

27.)    Two days later, after the Excel EEO Conference concluded, Ms. Banks came to Dr. Jones' hotel room, claiming that she needed a drink of water. The two then had a consensual sexual encounter, the one and only time the two had sex.

28.)    During the next several months, Ms. Banks attempted to initiate an on-going relationship with Dr. Jones.

29.)    Ms. Banks sent explicitly sexual text messages to Dr. Jones. One said: "I will make ur dick 'drown' … Like th Titanic."

30.)    Another text from Ms. Banks to Dr. Jones attached several unsolicited pictures of her vagina.

31.)    Still another asked Dr. Jones for a picture of his penis.

32.)     Ms. Banks tried to borrow money from Dr. Jones to support her while she pursued an EEO complaint against HUD.

33.)     Ms. Banks also emailed Dr. Jones that she needed money because she was living out of her car.

34.)     Dr. Jones never sent Ms. Banks any money or gave her any reason to believe that he would.

35.)     Ms. Banks also emailed Dr. Jones that her church cut her off after she resisted her deacon's demand for sex.

36.)     In another email, Ms. Banks asked Dr. Jones for help finding a hotel in Washington, D.C.

37.)     In another email, Ms. Banks let Dr. Jones know that she was disappointed in him for not sending her money.

## Ms. Banks Is Hired By HUD

38.)     Although Dr. Jones knew nothing of it, in the fall of 2009, Ms. Banks was pursuing a position as an EEO specialist at HUD.  Dr. Jones was unaware of Ms. Banks' application, and the position she was seeking was not under his supervision or in his unit of ODEEO.

39.)     Ms. Banks was offered the position she was seeking and started at HUD in or around April of 2010.  Dr. Jones had nothing to do with her selection.

40.)     The first Dr. Jones learned that Ms. Banks had become a HUD employee was in a staff meeting in April of 2010, when senior ODEEO management made her selection known.

41.)     From that point forward, Dr. Jones never spoke with Ms. Banks at the workplace and never met with her outside the workplace.

**Ms. Banks Claims Dr. Jones Sexually Assaulted Her**

42.)     On June 10 or June 11, 2010, Ms. Banks informed then Deputy Director of ODEEO, Michelle Cottom, that Dr. Jones had raped her during the Excel EEO Conference in July of 2009.  Ms. Banks' allegations were false.

43.)     Ms. Cottom responded by telling Ms. Banks that she might not have been the first woman Dr. Jones assaulted sexually, which Ms. Cottom knew was baseless.

44.)     Ms. Cottom also informed Ms. Banks that she would take care of Dr. Jones.

45.)     When she made these statements to Ms. Banks, Ms. Cottom had had very limited contact with Dr. Jones and no knowledge of any wrongdoing on his part.  In fact, she never questioned Dr. Jones, nor provided him an opportunity to respond to Ms. Banks' allegations.

46.)     Ms. Banks asked Ms. Cottom to keep the matter in confidence.  She did not ask management to limit her contact with Dr. Jones or take any other remedial action.

47.)     Despite Ms. Banks' request, her allegations were widely disseminated throughout HUD.  Ms. Cottom first conveyed the allegation that Dr. Jones had sexually assaulted Ms. Banks outside of HUD, to an employee at the United States Department of Agriculture (USDA), and then to her supervisor, ODEEO Director Linda Washington. This led to them being relayed to HUD's Employee Assistance Program coordinator, who in turn contacted George Corsoro, the Supervisory HR Specialist responsible for ODEEO

employee and labor relations.  The allegations against Dr. Jones were spread so widely that they were published in a HUD industry newsletter via internet.

48.)    When making the foregoing communications, HUD did not take sufficient measures to ensure Dr. Jones' confidentiality, damaged his reputation severely, and greatly harmed Dr. Jones' relationship with his spouse.

49.)    As Ms. Banks' allegations spread throughout ODEEO, one of its employees, Dianne Taylor, approached Ms. Banks and informed her that she knew everything about Ms. Banks' allegations and was aware of previous similar alleged and unsubstantiated incidents regarding Dr. Jones.   Ms. Taylor went through ODEEO hallways and publicly stated that everyone in the office knew what was going on with "Reverend Pimp Daddy Dr. Jones."

## Dr. Jones' Placement on Administrative Leave

50.)    On June 16, 2010, before giving Dr. Jones notice of the charges against him, Ms. Cottom summoned Dr. Jones to her office.  With two security officers present, Ms. Cottom placed Dr. Jones on paid administrative leave and had him escorted off HUD premises under guard.  Dr. Jones directly questioned to all involved about why he was being escorted out of the HUD facility.  He received no answer other than that he had supposedly engaged in "conduct unbecoming."

51.)    Dr. Jones remained on administrative leave for 20 months. Contemporaneously with initially placing Dr. Jones on paid administrative leave for two weeks, Ms. Cottom and/or other senior management officials asked HUD OIG to investigate him.

52.)    Ms. Cottom renewed Dr. Jones' placement on administrative leave periodically, sometimes at week intervals, until January 24, 2012.  As a result of being placed on administrative leave, Dr. Jones did not receive performance appraisals or bonuses for FY 2010 and FY 2011 which, in keeping with his immediately preceding performance appraisals as Director of ODEEO ADR, would have been at the level of Outstanding and carried with them performance bonuses; or accumulate annual leave as he was entitled to.  Dr. Jones' placement on extended administrative leave also harmed him greatly both personally, professionally and emotionally, and impacted his relationship with family, friends, colleagues and others.  He still suffers from trauma from being targeted by Ms. Banks and HUD and stigma throughout the agency.

53.)    During OIG's investigation, Ms. Banks surreptitiously taped a telephone conversation with Dr. Jones in which she tried to entrap Dr. Jones into admitting that he assaulted her.  Because Dr. Jones had done no such thing, Ms. Banks' effort was unsuccessful.

54.)    Dr. Jones was interviewed by OIG investigators on August 26, 2010.  By the time of Dr. Jones' interview, defendant was aware that Ms. Banks' allegations were not corroborated, not contemporaneous with Dr. Jones' alleged actions, and unreported to the police.  In fact, questions by the OIG investigators did not cover any of Ms. Banks' allegations.  Instead, and despite the fact that an EEO complaint or charge of discrimination or harassment had never been filed against Dr. Jones, OIG investigators asked Dr. Jones wide ranging questions, including many about his social/professional and cordial interactions with specific women who OIG investigators knew had never filed a complaint against Dr. Jones and who Dr. Jones knew socially.  Dr. Jones answered all of

OIG's questions forthrightly, thoroughly and candidly and denied engaging in any misconduct.

## Dr. Jones' Proposed Termination

55.)    Ms. Cottom proposed to terminate Dr. Jones' employment in a written notice dated January 6, 2011.  Ms. Cottom charged Dr. Jones with three Charges of misconduct, which were broken into seven specifications.

56.)    None of Ms. Cottom's charges included the original allegations made by Ms. Banks.

57.)    In issuing her proposal to remove Dr. Jones, Ms. Cottom contacted none of the three male agency employees whose assigned stations were outside of Dr. Jones' office and could, therefore, have provided exculpatory evidence about his conduct.

## Dr. Jones' Written Reply

58.)    On January 31, 2011, Dr. Jones filed his written reply to Ms. Cottom's notice of proposed removal with HUD Chief Operating Officer Estelle Richman.[1]

59.)    Ms. Cottom's first charge against Dr. Jones was that he had "engaged in sexual intimacy" with Ms. Banks during the afternoon of July 30, 2009, while Dr. Jones was to have been attending the Excel EEO Conference.  But for Dr. Jones truthfully volunteering information about his one encounter with Ms. Banks during his interview by OIG, HUD would have had no knowledge of it.

60.)    The date and time specified by Ms. Cottom as when Dr. Jones and Ms. Banks had consensual sex were correct.  However, by that time, the conference had ended.

---

[1]    Dr. Jones supplemented his original reply on February 4 and February 15, 2011, with copies of emails and text messages that further disproved Ms. Cottom's allegations.

61.)    Ms. Cottom also charged Dr. Jones with having attempted to interfere with the HUD OIG investigation when he called Ms. Banks on June 16, 2010.

62.)    The date and times specified by Ms. Cottom when Dr. Jones attempted to call Ms. Banks were also correct.  However, Ms. Cottom had not notified Dr. Jones that he was under investigation prior to then.  In addition, the OIG secret recording of the conversation clearly showed Dr. Jones advising Ms. Banks to "tell the truth."

63.)    Ms. Cottom's charges against Dr. Jones also included allegations that he had supposedly acted inappropriately toward four women and lacked candor when he denied having done so to OIG.

64.)    Beyond convincingly denying these allegations, Dr. Jones also showed that they were stale and found to have been unsubstantiated when independently investigated; and that one was based on his having "high fived" a female friend and colleague who had asked Dr. Jones to perform her second wedding ceremony and wished him a "blessed" Thanksgiving after he supposedly harassed her.  This same friend and Dr. Jones travelled together for HUD and frequently had lunch together.

65.)    Dr. Jones also replied by offering detailed affidavits from two senior female HUD officials who attested to his impeccable character while they worked and traveled together on high level labor management negotiations.  Dr. Jones' reply also recounted that he had counseled hundreds if not thousands of women in his role as Director of the HUD ADR program, and that not a single one of them had voiced a complaint about him.

66.)    Dr. Jones concluded his written reply to the notice of proposed removal by demonstrating and arguing that in charging him and conducting an inadequate

13

investigation, Dr. Jones had been the victim of disparate treatment.   Among other matters, Dr. Jones pointed to the fact that Ms. Banks was still actively employed by HUD, even though by the time it proposed to remove Dr. Jones, HUD knew full well that Ms. Banks' charges were uncorroborated and that she was not reliable.

### Dr. Jones' First Oral Reply

67.)     On March 29, 2011, Dr. Jones replied to HUD's charges orally for the first time, in person to Dan Lurie, a Special Assistant to the HUD Deputy Secretary, who HUD appointed to replace Ms. Richman the original deciding official.   George Corsoro, the official representative of HUD's responsible employee and labor relations division, also attended.

68.)     Dr. Jones' oral reply irrefutably proved that the three principal charges against him, i.e., having had sex with Ms. Banks while in a duty status, interfering with an OIG investigation, and harassing women other than Ms. Banks, were false and based on accounts of witnesses who were not interviewed, were not credible, and had not filed a complaint at the agency.   Dr. Jones also showed that HUD's investigation of him conspicuously failed to interview any of his male colleagues and subordinates who would have provided exculpatory evidence since their work stations were right outside Dr. Jones's office.   These men would have attested to the fact they had never seen Dr. Jones harass any of the thousands of women he counseled as Director of ADR or received or even heard about complaints by any women about his behavior.

**HUD Concludes That Dr. Jones Would Not Be Terminated**

69.)     No later than June of 2011, Mr. Lurie concluded that Ms. Cottom's charges against Dr. Jones would not be sustained and that he would not be removed from federal service.

70.)     Instead, Dr. Jones would have to be restored to active duty and was going to remain in the position he encumbered in his chosen career field, Alternative Dispute Resolution.

71.)     Nonetheless, rather than take these actions, HUD kept Dr. Jones on administrative leave despite knowing that any remaining charges against him provided insufficient grounds to keep him in a non-duty status.

**Dr. Jones' Second Oral Reply**

72.)     Rather than restore Dr. Jones to active duty, on October 3, 2011, HUD notified Dr. Jones that it had appointed a third deciding official, Patricia Hoban-Moore, Director of HUD Field Policy and Management, now Director of the Office of Administration.

73.)     On October 11, 2011, Dr. Jones appeared before Ms. Hoban-Moore for a second oral reply.  In that session, Dr. Jones again successfully demonstrated that the charges against him were false and that he was the victim of a conspiracy and disparate treatment.  Dr. Jones also demonstrated that since the deciding official had not taken steps to ascertain the credibility of the women he had supposedly harassed, she had no basis for concluding that they were more credible than he.

## HUD Attempts To Coerce Dr. Jones Into Resigning or Retiring

74.) No later than November of 2011, even Ms. Hoban-Moore determined that HUD's charges were unsubstantiated and that Dr. Jones had to be restored to active duty and reinstated in a suitable position.

75.) Instead of issuing Ms. Hoban-Moore's decision, HUD attempted to coerce Dr. Jones into resigning or retiring.

76.) In November of 2011, HUD notified Dr. Jones that Ms. Hoban-Moore was about to issue a decision and that Dr. Jones should consider retiring or resigning before she did.  HUD offered to clear Dr. Jones' record of all charges if he were to retire or resign.

77.) Dr. Jones was given contact information for a HUD HR Representative, Lorraine L. Smith, so he could definitively determine what effect there would be on his Civil Service Retirement if he were terminated before retiring.  Dr. Jones emailed and spoke with Ms. Smith in an attempt to obtain this information.

78.) HUD knew that Dr. Jones would be relying on Ms. Smith's expert knowledge of the Civil Service Retirement System in deciding whether to resign or retire before HUD issued Ms. Hoban-Moore's decision.

79.) Repeatedly, Ms. Smith gave Dr. Jones false and misleading information that he would lose his pension and all associated benefits if Ms. Hoban-Moore decided to remove him before he resigned or retired.

80.) HUD repeatedly imparted this information to Dr. Jones in order to induce him to resign or retire without waiting for the decision of Ms. Hoban-Moore, who by that time had made the decision not to terminate him.

81.)    Finally, after many exchanges with Dr. Jones, Ms. Smith was forced to admit that Dr. Jones' pension would not be affected by Ms. Hoban-Moore's decision, at which point Dr. Jones decided not to retire or resign.

## **Decision Not To Remove Dr. Jones**

82.)    HUD issued Ms. Hoban-Moore's decision in a Memo dated January 24, 2012, which rejected the proposal to remove Dr. Jones and instead suspended him for five days.

83.)    In her decision, Ms. Hoban-Moore dismissed five of the seven charges against Dr. Jones as groundless.

84.)    Ms. Hoban-Moore improperly sustained two charges, one concerning a woman who was Dr. Jones' friend and the other concerning an alleged incident with a female HUD employee that had supposedly occurred years earlier and that HUD's independent investigator concluded was unsubstantiated.

85.)    Neither charge was true nor was there ever a complaint filed in the agency on either charge.

86.)    Ms. Hoban-Moore's decision also advised Dr. Jones that he was being reassigned out of his position as Director of the ODEEO ADR program into a separate division of HUD.

### Dr. Jones' Return To Active Duty

87.)     Ms. Hoban-Moore's decision of January 24, 2012, directed Dr. Jones to report to HUD's Office Operations and Coordination.  On February 13, 2012, Dr. Jones returned to active duty as directed.

88.)     Although HUD had known for a month or more that Dr. Jones' would be returning to the workplace in a paid duty status, HUD had taken no steps to assign him duties or to a particular position even though he was still officially the ADR Director. For over two hours, while Dr. Jones sat in the HUD lobby and could not obtain access to the HUD building, he repeatedly alerted HUD that it did not specify any place for him to report to on his return as HUD officials had indicated in the decision letter.

89.)     Effective February 13, 2012, even though it had slated to return Dr. Jones as the Director of HUDs' Employee Assistance Program, HUD instead reassigned Dr. Jones to a lower level, non-supervisory position outside of Dr. Jones' career field.  In contrast to Dr. Jones' former position as Director of the ODEEO ADR program and HUD Ombudsman, the non-supervisory position to which HUD reassigned Dr. Jones had markedly fewer and less important responsibilities, gave him no exposure to senior agency officials, and offered him no chance for career advancement.  Despite repeated requests by Dr. Jones to be placed in a position commensurate with his background and experience, HUD has kept him as an acting branch chief, until he was recently, under objection, reassigned to a non-supervisory, management/program analyst staff position out of his chosen career field.

### Exhaustion Of Administrative Remedies

90.)    No later than March 8, 2012, Dr. Jones timely initiated the informal administrative EEO complaints process over being removed from his former position as Director of the ODEEO agency-wide Alternative Dispute Resolution program, reassigned to a non-supervisory position outside of his chosen career field that was not equivalent to his former position, subject to investigation, suspended without pay, and all of the other adverse employment actions and materially adverse actions that are the subjects of the Complaint on the grounds of his race (African American), his sex (male) and his race plus sex.  On or before May 18, 2012, Dr. Jones filed his formal EEO complaint over these actions.   More than 180 days have elapsed since Dr. Jones filed his formal complaint without the issuance of a Final Agency Decision by defendant.

91.)    By the foregoing actions and all others required of him by law and regulation, Dr. Jones has exhausted administrative remedies available to him, including proposing a settlement offer to defendant.

**COUNT I**
**(<u>Discrimination Based on Race Plus Sex</u>)**

92.)    Plaintiff repeats the allegations contained in paragraphs 1 through 91 above, as though fully set forth here.

93.)    Plaintiff is an African American male.

94.)    Defendant took adverse employment actions against plaintiff when:  a.) on January 24, 2012, defendant suspended plaintiff for five days without pay, removed plaintiff from his position as Director of ADR in HUD ODEEO, and reassigned plaintiff to a nonsupervisory position with significantly reduced duties, professional exposure to senior officials of HUD, and opportunity for professional advancement; b.) in June of 2011, failed to dismiss the notice proposing to terminate plaintiff's employment and

19

restore plaintiff to active duty in the position of Director of ADR in ODEEO; c.) beginning on June 16, 2010, placed plaintiff on administrative leave and under investigation, which caused plaintiff to lose performance bonuses and to be denied annual leave for FY 2010 and FY 2011 that he would have accrued and received but for defendant's unlawful actions; and d.) stigmatized plaintiff and caused great harm in his personal life and to his professional reputation and ended any chance for career advancement.

95.)     Defendant took the foregoing adverse employment actions against plaintiff without cause and despite the fact that the charges against plaintiff were baseless, not grounds for termination or other disciplinary action, and based on an incomplete record and biased investigation.

96.)     Defendant took the foregoing adverse employment actions in order to discriminate against plaintiff because he is an African American male, and in whole or in part on a stereotype of Dr. Jones as an African American male being prone to sexual promiscuity and the use of force against women.

97.)     Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, in taking the foregoing actions.

98.)     Defendant's violation of plaintiff's civil rights caused him to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life.

## COUNT II
## (<u>Discrimination Based on Sex</u>)

99.)    Plaintiff repeats the allegations contained in paragraphs 1 through 100 above, as though fully set forth here.

100.)    Plaintiff is a male.

101.)    Defendant took adverse employment action against plaintiff when:  a.) on January 24, 2012, defendant suspended plaintiff for five days without pay, removed plaintiff from his position as Director of ADR in HUD ODEEO, and reassigned plaintiff to a nonsupervisory position with significantly reduced duties, professional exposure to senior officials of HUD, and opportunity for professional advancement; b.) in June of 2011, failed to dismiss the notice proposing to terminate plaintiff's employment and restore plaintiff to active duty in the position of Director of ADR in ODEEO; c.) beginning on June 16, 2010, placed plaintiff on administrative leave and under investigation, which caused plaintiff to lose performance bonuses and to be denied annual leave for FY 2010 and FY 2011 that he would have accrued and received but for defendant's unlawful actions; and d.) stigmatized plaintiff and caused great harm in his personal life and to his professional reputation and ended any chance for career advancement.

102.)    Defendant took the foregoing adverse employment actions against plaintiff without cause and despite the fact that the charges against plaintiff were baseless, not grounds for termination or other disciplinary action, and based on an incomplete record and biased investigation.

103.)    Defendant took the foregoing adverse employment actions in order to discriminate against plaintiff because he is a male.

104.)   Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, in taking the foregoing actions.

105.)   Defendant's violation of plaintiff's civil rights caused him to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life.

### COUNT III
### (Discrimination Based on Race)

106.)   Plaintiff repeats the allegations contained in paragraphs 1 through 105 above, as though fully set forth here.

107.)   Plaintiff is African American.

108.)   Defendant took adverse employment action against plaintiff when:  a.) on January 24, 2012, defendant suspended plaintiff for five days without pay, removed plaintiff from his position as Director of ADR in HUD ODEEO, and reassigned plaintiff to a nonsupervisory position with significantly reduced duties, professional exposure to senior officials of HUD, and opportunity for professional advancement and ended any chance for career advancement; and b.) in June of 2011, failed to dismiss the notice proposing to terminate plaintiff's employment and restore plaintiff to active duty in the position of Director of ADR in ODEEO.

109.)   Defendant took the foregoing adverse employment actions against plaintiff without cause and despite the fact that the charges against plaintiff were baseless, not grounds for termination or other disciplinary action, and based on an incomplete record and biased investigation.

110.)   Defendant took the foregoing adverse employment actions in order to discriminate against plaintiff because he is African American.

111.)   Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, in taking the foregoing actions.

112.)   Defendant's violation of plaintiff's civil rights caused him to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life.

## COUNT IV
### (Retaliation)

113.)   Plaintiff repeats the allegations contained in paragraphs 1 through 112 above, as though fully set forth here.

114.)   On January 31, 2011, plaintiff engaged in protected EEO activity in his written reply to the proposal to terminate his employment by arguing and demonstrating that defendant's actions against him were discriminatory based on disparate treatment.

115.)   On March 29, 2011, plaintiff again engaged in protected EEO activity in his first oral reply to the proposal to terminate his employment by arguing and demonstrating that defendant's actions against him were discriminatory based on disparate treatment.

116.)   On October 11, 2011, plaintiff engaged in protected EEO activity in his second oral reply to the proposal to terminate his employment by arguing and demonstrating that defendant's actions against him were discriminatory based on disparate treatment.

117.)   Defendant took materially adverse action against plaintiff that would dissuade a reasonable worker from making or supporting a charge of discrimination when:  a.) on January 24, 2012, defendant suspended plaintiff for five days without pay, removed plaintiff from his position as Director of ADR in HUD ODEEO, and reassigned

plaintiff to a nonsupervisory position with significantly reduced duties, professional exposure to senior officials of HUD, and opportunity for professional advancement; b.) in June of 2011, failed to dismiss the notice proposing to terminate plaintiff's employment and restore plaintiff to active duty in the position of Director of ADR in ODEEO; c.) beginning on June 16, 2010, placed plaintiff on administrative leave and under investigation, which caused plaintiff to lose performance bonuses and to be denied annual leave for FY 2010 and FY 2011 that he would have accrued and received but for defendant's unlawful actions; and d.) stigmatized plaintiff and caused great harm in his personal life and to his professional reputation and ended any chance for career advancement.

118.)   Defendant took the foregoing adverse employment actions against plaintiff without cause and despite the fact that the charges against plaintiff were baseless, not grounds for termination or other disciplinary action, and based on an incomplete record and biased investigation.

119.)   Defendant took the foregoing adverse employment actions in order to retaliate against plaintiff for his protected EEO activity.

120.)   Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, in taking the foregoing actions.

121.)   Defendant's violation of plaintiff's civil rights caused him to suffer emotional pain, embarrassment, humiliation, mental anguish, inconvenience, anxiety, depression, and loss of enjoyment of life.

## **PRAYER FOR RELIEF**

Wherefore, plaintiff Dr. Jerry Jones, Jr., respectfully requests that the Court enter judgment in his favor and award him the following relief:

A.     An Order declaring that defendant violated plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16, and restraining and enjoining defendant from further violations.

B.     Reinstatement in his former position as Director of the Alternative Dispute Resolution division of the Office of Departmental Equal Employment Opportunity of the Department of Housing and Urban Development and agency Ombudsman.

C.     Backpay for the five days of Dr. Jones' suspension and commensurate benefits.

D.     Cash bonuses and annual leave Dr. Jones was denied for Fiscal Years 2011 and 2012 as a result of being placed on administrative leave and under investigation.

E.     Expungement of all matters that comprise the charges against plaintiff, the evidence allegedly supporting those matters, and defendant's decision letter about those charges from all agency files.

E.     Compensatory damages in an amount to be determined at trial to compensate plaintiff for the emotional pain, embarrassment, humiliation, mental anguish, inconvenience, career loss, loss of professional reputation and career opportunities, and loss of enjoyment of life caused by defendant's unlawful actions.

F.     The attorneys' fees and costs incurred by plaintiff.

G.     Such other relief as may be just and appropriate.

## JURY DEMAND

Plaintiff requests a trial by jury of all issues so triable.

Respectfully submitted,

Robert C. Seldon, Esq.
D.C. Bar No. 245100

Lauren Marsh Drabic, Esq.
D.C. Bar No. 1011323
Seldon Bofinger & Associates, P.C.
1319 F Street, N.W., Suite 200
Washington, D.C.  20004
(202) 393-8200
Counsel for Plaintiff