## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**JERRY W. JONES JR.**                  )
                                        )
              **Plaintiff,**            )
**v.**                                  )          **Civil Action No. 15-310 (CKK/GMH)**
                                        )
**BENJAMIN CARSON, SR.,**[1]            )
**Secretary of Housing and Urban Development**  )
                                        )
              **Defendant.**            )
_____)

### MEMORANDUM OPINION

Plaintiff Jerry Jones is an employee of the United States Department of Housing and Urban

Development ("HUD") and was formerly the Director of Alternative Dispute Resolution ("ADR")

in the Office of Departmental Equal Employment Opportunity ("ODEEO") at HUD.  He brings

this action under Title VII of the Civil Rights Act of 1964, as amended, claiming that HUD

discriminated against him on the basis of his race (African-American), his gender, or the

combination of his race and gender, by imposing a five-day suspension and reassigning him to a

position outside his career field in 2012.  [Dkt. 38 at 1; Dkt. 53 at 4].

On August 17, 2017, the undersigned was referred Plaintiff's pending Motion to Compel

for resolution pursuant to Local Civil Rule 72.2(a).[2]  _See_ Minute Entry dated Aug. 17, 2017.

Plaintiff claims Defendant withheld as privileged documents that he needs to explore alleged

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Benjamin Carson, Sr., who currently serves as the Secretary of Housing and Urban Development, will be substituted for the former Secretary, Julian Castro.

[2] The briefs submitted in connection with Plaintiff's Motion to Compel [Dkt. 53] are: Defendant's Opposition to Plaintiff's Motion to Compel [Dkt. 62]; Reply in Support of Plaintiff's Motion to Compel [Dkt. 65]; Defendant's Notice of Filing Discovery Documents [Dkt. 73]; and Plaintiff's Response to Defendant's Revised Privilege Log and Related Declarations [Dkt. 74].

inconsistencies between Department officials' deposition testimony as to the reasons for Plaintiff's discipline and their contemporaneous reasoning memorialized in the withheld documents.[3] Plaintiff asks this Court to compel production of all documents identified in Defendant's privilege log. [Dkt. 53 at 1; Dkt. 72 at 42–43]. Defendant—after several revisions of its privilege log since the commencement of this action—ultimately asserts work-product protection and attorney-client privilege over 127 emails or documents listed by "item" number in its log. [Dkt. 73-1]. The Court will identify documents in this Memorandum Opinion by the item numbers in the log Defendant filed with the Court on November 30, 2017.[4] *Id.*

The Court held a hearing on October 23, 2017, to address the parties' arguments. [Dkt. 72]. After a thorough review of record, including an *in camera* review of all of the withheld documents, the Court will grant in part and deny in part Plaintiff's Motion to Compel. [Dkt. 53].

## I.        BACKGROUND

### A.       Factual History

According to the Complaint, Plaintiff began his service as the Director of HUD's ADR program in February 2005. [Dkt. 1, ¶ 18]. On June 10 or 11, 2010, a HUD employee ("D.B.") informed Michelle Cottom, then the deputy director of the ODEEO at HUD, that Plaintiff had

---

[3] Nowhere in the government's opposition does it argue that the documents that Plaintiff seeks are irrelevant to this matter. [Dkt. 62]. Accordingly, the Court will leave to later proceedings a determination of the relevance of the documents at issue. The Court similarly finds immaterial to any issue before it Plaintiff's contentions (1) that Defendant refused to permit agency representatives to view privileged material at their depositions, and (2) that these representatives' recollection of various events was not refreshed by review of Defendant's privilege log during their depositions. [Dkt. 53 at 10; Dkt. 62 at 18–20].

[4] Documents submitted to the Court for *in camera* review were collected in tabbed binders. For some reason, the government's binder sometimes included more than one "item" from its privilege log behind a given tab in the binder, so that the "tab" and "item" numbers for a particular document do not necessarily correspond. Because the "item" numbers are more specific, they will be used as points of reference in this Memorandum Opinion. To determine which tab number corresponds with which item number, and vice-versa, the first two columns of the second revised privilege log should be consulted. [Dkt. 73-1].

sexually assaulted her in July 2009, prior to the time that D.B. joined HUD.  *Id.* ¶¶ 39, 42.  Plaintiff denies that allegation.  *Id.* ¶ 42.

On June 16, 2010, Ms. Cottom placed Plaintiff on paid administrative leave prior to giving him notice of the charges against him.  *Id.* ¶ 50.  He was immediately escorted out of the HUD facility.  *Id.*  He was initially placed on paid administrative leave for a period of two weeks, and at that time, Ms. Cottom and/or other senior management officials asked HUD's Office of Inspector General ("OIG") to investigate him.  *Id.* ¶ 51.  While the investigation was ongoing, the agency renewed Plaintiff's paid administrative leave periodically through January 24, 2012, for a period of twenty months total.  *Id.* ¶¶ 51–52.

In a written notice dated January 6, 2011, Ms. Cottom proposed to terminate Plaintiff's employment with HUD.  *Id.* ¶ 55. The notice charged Plaintiff with several instances of misconduct but did not include the allegation of sexual assault.  *Id.* ¶¶ 55–56.  It did include claims that Plaintiff had harassed or acted inappropriately towards four other women and that he lacked candor by denying those allegations to OIG.  *Id.* ¶¶ 63, 68.  HUD also engaged in disciplinary proceedings against D.B., proposing her termination and ultimate removal in 2011.  [Dkt. 73-2].

At a meeting on March 29, 2011, Plaintiff replied to HUD's charges orally for the first time.  [Dkt. 1, ¶ 67].  The meeting was attended by Daniel Lurie, the Deciding Official[5] and a Special Assistant to the Deputy Secretary of HUD, and by George Corsoro, the responsible official representative of HUD's Employee and Labor Relations division ("HUD-ELR").  *Id.*  On October 3, 2011, and after Mr. Lurie's retirement, HUD informed Plaintiff that it had appointed a new Deciding Official, Patricia Hoban-Moore, who was at that time the Director of HUD Field Policy and Management.  *Id.* ¶ 72.  On October 11, 2011, Plaintiff appeared before Ms. Hoban-Moore for

---

[5] For each HUD adverse action there is a Proposing Official, who proposed the action, and a Deciding Official, who made the final decision.

a second oral reply.  *Id.* ¶ 73.  No later than November 2011, Ms. Hoban-Moore determined that Plaintiff was to be restored to active duty and reinstated in a suitable position.  *Id.* ¶ 74.

HUD issued Ms. Hoban-Moore's decision on the Notice of Proposed Removal on January 24, 2012.  *Id.* ¶ 82.  It rejected Plaintiff's removal from the agency and instead suspended him for five days.  *Id.*  Ms. Hoban-Moore dismissed five of the seven charges against Plaintiff and sustained two of the charges.  *Id.* ¶¶ 83–84.  She also reassigned Plaintiff from his former position as Director of the ODEEO ADR program into a non-supervisory position in a separate HUD division.  *Id.* ¶ 86.  Plaintiff alleges that the reassignment into a position outside of his career field with fewer and less important responsibilities and fewer opportunities for advancement was a result of race and/or gender discrimination.  *Id.* ¶ 89; [Dkt. 53 at 4].

### B.  Procedural History

Following this Court's decision on Defendant's motion for judgment on the pleadings, the only claims remaining are those challenging as discriminatory Plaintiff's five-day suspension and subsequent reassignment.  [Dkt. 21 at 26; Dkt. 38 at 1].  Discovery on those claims began in October 2016 and closed on July 20, 2017.  [Dkt. 42]; Minute Order dated July 12, 2017.  On July 11, 2017, Plaintiff filed the instant motion seeking to compel HUD's production of a more detailed privilege log and copies of all items identified in the log.  [Dkt. 53].  The primary focus of Plaintiff's motion is its request for the production of drafts of the documents proposing his removal from HUD, as well as documents proposing removal or other adverse action as to three other HUD employees, D.B., D.T., and S.C.  *Id.* at 15.  In response to Plaintiff's motion to compel, HUD revised its initial privilege log twice and requested *in camera* review of the materials it continues to withhold as protected under either the work-product doctrine or the attorney-client privilege. [Dkt. 62 at 4; Dkt. 62-1; Dkt. 73-1].  The Court held a hearing on October 23, 2017, to address the

parties' arguments on the motion.  Thereafter, it ordered all the material identified in Defendant's revised privilege log be submitted for *in camera* review.[6]  [Dkt. 72 at 97].  In total, the Court reviewed 127 emails or documents—approximately two large binders of material—withheld by Defendant as protected by either the work-product doctrine or attorney-client privilege.

## II.    LEGAL STANDARDS

### A.    Work-Product Protection

The work-product doctrine is codified in Federal Rule of Civil Procedure 26(b)(3), which provides, in relevant part:

> (A)    *Documents and Tangible Things*. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> (i)    they are otherwise discoverable under Rule 26(b)(1); and
>
> (ii)    the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> (B)    *Protection Against Disclosure*. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

---

[6] In the context of determining the merits of a privilege claim, the Supreme Court "has approved the practice of requiring parties who seek to avoid disclosure of [otherwise privileged] documents to make the documents available for *in camera* inspection." *United States v. Zolin*, 491 U.S. 554, 569 (1989) (citing *Kerr v. U.S. Dist. Court for N. Dist. of Cal.*, 426 U.S. 394, 404–05 (1976)). While, "[w]ithout some reason to doubt the veracity or accuracy of the defendants' claims of privilege and protection, there is no need for *in camera* review of the documents," *Graham v. Mukasey*, 247 F.R.D. 205, 207 (D.D.C. 2008), there was some reason for concern here.  In total, Defendant has submitted three versions of its privilege log, with significant revisions each time.  [Dkt. 53-3; Dkt. 62-1; Dkt. 73-1].  Further, in at least one instance, an email was withheld on the basis of attorney-client privilege, but when later released by Defendant it showed no basis for the privilege.  [Dkt. 65-3].

Fed. R. Civ. P. 26(b)(3)(A)–(B).  The Supreme Court has observed that the work-product doctrine is "an intensely practical one, grounded in the realities of litigation in our adversary system." *United States v. Nobles*, 422 U.S. 225, 238 (1975).

Importantly, under Rule 26, the party asserting work-product protection must first show that the document in question was prepared "in anticipation of litigation."  Fed. R. Civ. P. 26(b)(3)(A).  In this Circuit, we apply the "because of" test, which asks "'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'"  *F.T.C. v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015) (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010)).  "Where a document would have been created 'in substantially similar form' regardless of the litigation, work product protection is not available."  *Id.* (quoting *Deloitte*, 610 F.3d at 138).  "For a document to meet this standard, the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable."  *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998).  "While litigation need not be imminent or certain," it must be "'fairly foreseeable at the time' the materials were prepared."  *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 75 (D.D.C. 2003) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980)).

### B.    Attorney-Client Privilege

The attorney-client privilege is the oldest of the common law privileges.  It exists to encourage "full and frank communication between attorneys and their clients, and thereby promote broader public interests in the observance of law and administration of justice."  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  It protects confidential communications between clients

6

and their attorneys made for the purpose of securing or providing legal advice or services.  *See Tax*

*Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997).  The privilege applies only if:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984) (quoting *United States v. United Shoe*

*Mach. Corp.*, 89 F. Supp. 357, 358–59 (D. Mass. 1950)).

The fact that an attorney is counsel for a government agency does not dilute the attorney-

client privilege.  Where the requirements for it are met, this Court has held—and, indeed, Plaintiff

concedes [Dkt. 72 at 11]—legal communications between government agency counsel and his or

her government client are entitled to the protection of the attorney-client privilege (and work-

product doctrine).  *General Elec. Co. v. Johnson*, No. Civ. A 00-2855 (JDB), 2006 WL 2616187,

at *14 (D.D.C. Sept. 12, 2006) (the "contention that government lawyers are categorically less

entitled than private lawyers to invoke the attorney-client privilege as a basis for withholding

information is without merit"); *see also In re Sealed Case*, 737 F.2d at 99 ("The lawyer whose

testimony the government seeks in this case served as in-house attorney.  That status alone does

not dilute the privilege.").  "In the government context, the holder of the privilege, or the 'client,'

is the agency or department."  *Gangi v. U.S. Postal Serv.*, 97 M.S.P.R. 165, 176 (M.S.P.B. 2004);

*see also Coastal States*, 617 F.2d at 863 (an agency can be a "client" and agency lawyers can

function as "attorneys" for purpose of the privilege).  As such, the agency is "dealing with its

attorneys as would any private party seeking advice to protect personal interests, and needs the

same assurance of confidentiality so it will not be deterred from full and frank communications

with its counselors." *Cuban v. S.E.C.*, 744 F. Supp. 2d 60, 78 (D.D.C. 2010), *on reconsideration in part*, 795 F. Supp. 2d 43 (D.D.C. 2011).

Like many lawyers in the private sector who serve in multiple capacities, agency lawyers' communications are protected so long as they "relate to some legal strategy, or to the meaning, requirements, allowances, or prohibitions of the law." *General Elec. Co.*, 2006 WL 2616187, at *15. To determine whether a communication was made for a legal as opposed to a business purpose, courts in this Circuit apply the "primary purpose test." This test asks whether "one of the significant purposes" of the communication was to obtain or give legal advice. *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757–60 (D.C. Cir. 2014). In further defining the contours of this test in *Kellogg*, our Court of Appeals rejected a strict "but for" analysis under which a communication would not be deemed privileged if there was any purpose behind it other than seeking or providing legal advice. *Id.* at 759. As the D.C. Circuit instructed in *Kellogg*:

> Under the [but-for test], the attorney-client privilege apparently would not apply unless the sole purpose of the communication was to obtain or provide legal advice. That is not the law. . . [That] novel approach to the attorney-client privilege would eliminate the attorney-client privilege for numerous communications that are made for both legal and business purposes and that heretofore have been covered by the attorney-client privilege.

*Id.* Rather, the primary purpose test in this Circuit asks the question, "[w]as obtaining or providing legal advice a primary purpose of the communication, meaning one of the significant purposes of the communication?" *Id.* at 760. As the *Kellogg* Court explained, this test:

> cannot and does not draw a rigid distinction between a legal purpose on the one hand and a business purpose on the other. After all, trying to find *the* one primary purpose for a communication motivated by two sometimes overlapping purposes (one legal and one business, for example) can be an inherently impossible task. It is often not useful or even feasible to try to determine whether the purpose was A or B when the purpose was A and B.

*Id.* at 759.

Nevertheless, this Court and the D.C. Circuit have consistently emphasized that "attorney-client privilege must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle.'" *In re Lindsey*, 158 F.3d 1263, 1272 (D.C. Cir. 1998) (quoting *In re Sealed Case*, 676 F.2d 793, 807 n.44 (D.C. Cir. 1982)).   This privilege "carries costs," including the withholding of potentially critical evidence from the factfinder.  *Kellogg*, 756 F.3d at 764.  Courts tolerate the privilege only to the extent necessary "to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (quoting *Upjohn*, 449 U.S. at 389); *W. Trails, Inc. v. Camp Coast to Coast, Inc.*, 139 F.R.D. 4, 8 (D.D.C. 1991) ("The privilege is an exception . . . to the fundamental principle that discovery should be liberal and broad in furtherance of the search for truth.").

### III.    DISCUSSION

### A.    Sufficiency of Defendant's Privilege Log

Plaintiff claims the privilege log is insufficient under the Federal Rules to allow him to assess the applicability of attorney-client privilege or work-product protection.  [Dkt. 53 at 11; Dkt. 72 at 38].   Federal Rule of Civil Procedure 26(b)(5)(A)(ii) requires that when a party withholds otherwise discoverable information, the party must "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  F.R.C.P. 26(b)(5)(A)(ii).  As that rule recognizes, creating a privilege log is not a simple task.  Proponents of the privilege must give enough information so that the party seeking production of the materials in question can assess the proper applicability of the privilege, but not say so much in the log that the privileged material is disclosed and protection potentially waived.

In this Court, privilege logs generally should "state the basis upon which the privilege is claimed, state the subject matter, number of pages, author, date created, and the identity of all persons to whom the original or any copies of the document were shown or provided." *Loftin v. Bande*, 258 F.R.D. 31, 33 (D.D.C. 2009) (quoting *Dir. of Office of Thrift Supervision v. Ernst & Young*, 795 F. Supp. 7, 11–12 (D.D.C. 1992)).

Measured by these standards, the government's original privilege log, filed on May 25, 2017, was insufficient.  [Dkt. 53-3].  For each of its 177 entries, it identified only the author and recipients of the document in question, and provided only very general descriptions of the basis for the privilege asserted such as "[p]roviding guidance on Jones case," "[p]rovides guidance re case," or "[d]iscussion between HUD counsel re case." *Id.* at 2–3.  These descriptions are too brief to adequately "inform the requestor of the character of the information being withheld from him or her." *Alexander v. F.B.I.*, 198 F.R.D. 306, 312 (D.D.C. 2000).

The government submitted a revised privilege log on July 25, 2017, together with its response to Plaintiff's motion to compel (the "revised log").  [Dkt. 62-1].  The revised log dropped claims of privilege as to approximately 50 items listed on the original privilege log, but added claims of work-product protection to approximately 95 items where the government had previously asserted only attorney-client privilege.  [Dkt. 53-3; Dkt. 62-1].  Adding to the information contained in its initial log, the revised log provided for each item the subject header of the communications or emails being withheld and a more detailed description of the basis of the privilege asserted, e.g., "[e]mail from agency employee to counsel seeking legal advice re conditions of administrative leave for Jones," "[e]mail from counsel providing legal advice re responding to Plaintiff's counsel's request to extend administrative leave," or "[d]raft of notice of

proposed removal for Jones prepared at direction of counsel and in reasonable anticipation of litigation." [Dkt. 62-1 at 3–5].

Plaintiff nevertheless maintained at the October 23, 2017, hearing that certain entries in the revised log remained insufficient, specifically items 37, 51–55, 58, 61–62, 65–68, 98–100, 119–122, and 127.  [Dkt. 72 at 44–47, 102].  These included drafts of Notices of Proposed Removal, as well as drafts of the Decisions on Removal that were prepared by, and circulated among, non-attorney HUD-ELR employees involved in the decision-making process.  *Id.*  At the direction of the Court, Defendant filed a second revised privilege log on November 30, 2017 (the "second revised log") providing more detailed descriptions of the items on the revised log that Plaintiff challenged at the October 23, 2017 hearing.  [Dkt. 72 at 102; Dkt. 73-1].  For example, item 37, which Defendant described in the revised log as a "[d]raft of notice of proposed removal for Jones prepared at direction of counsel and in reasonable anticipation of litigation," [Dkt. 62-1 at 5], is described in the second revised log as a "[d]raft of notice of proposed removal for Jones prepared at direction of counsel and in reasonable anticipation of litigation.  The draft was also sent to [HUD's Office of General Counsel or "HUD-OGC"] the same day (tab 29) for legal review (See Harrison affidavit)."  [Dkt. 73-1 at 6; Dkt. 73-5, ¶ 5].  Similarly, item 98 was previously described in the revised log as a "[d]raft of decision on proposal to remove Jones prepared at direction of counsel and in reasonable anticipation of litigation," [Dkt. 62-1 at 14], but is now described as "[d]raft of decision on proposal to remove Jones prepared at direction of counsel and in reasonable anticipation of litigation.  Email states that Bratten forwarded the attached draft to HUD-OGC for legal sufficiency review. (See Bratten affidavit.)."  [Dkt. 73-1 at 16; Dkt. 73-2, ¶ 14].  In both cases, the declarations submitted with Defendant's second revised log, referenced in these entries, provide further explanation and context for the assertions of privilege for the items challenged,

including the Human Resources ("HR") Specialists' and HUD-OGC counsel's understanding of the process of legal sufficiency review of those documents.

The Court has reviewed each of the challenged entries on the second revised log, as well as Defendant's supplemental declarations, and together finds them sufficient under Rule 26(b)(5)(A)(ii). While it admonishes the government for not including in its original log the level of detail found in its second revised log and supplemental declarations, the Court finds that the deficiencies have now been cured. The descriptions in the second revised log and supplemental declarations are more than sufficient to "inform the requestor of the character of the information being withheld from him or her," *Alexander*, 198 F.R.D. at 312, and to permit the requestor a fair opportunity to formulate legal arguments for why the information should be disclosed—which Plaintiff has certainly had here.[7]

### B.    Application of Work-Product Protection

Defendant invokes work-product protection for 120 documents listed on the second revised privilege log. [Dkt. 73-1]. Defendant claims *only* work-product protection for two of these documents—items 5 and 76 on the log. For all other documents on the log, Defendant asserts both work-product protection and attorney-client privilege.[8]

Plaintiff contends that none of Defendant's claims of work-product protection are valid because the documents at issue were not prepared in anticipation of litigation. [Dkt. 74 at 7]. To make that showing, the D.C. Circuit instructed in *Boehringer* that the party asserting work-product protection must demonstrate that in light of the "nature of the document" at issue and "the factual

---

[7] Plaintiff was permitted to file a supplemental response after the government filed its second revised privilege log and supplemental declarations. [Dkt. 74].

[8] Many of these claims of work-product protection were seemingly an afterthought. The government invoked work-product protection for only 20 items in its original privilege log. [Dkt. 53-3]. Its revised privilege log added claims of work-product protection to approximately 95 additional items. [Dkt. 62-1].

situation of a particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." 778 F.3d at 149 (emphasis added). Plaintiff asserts that many, if not all, of the documents at issue fail to satisfy this "because of" test because they would have been created regardless of the threat of impending litigation given that HUD's policies required that the documents related to Plaintiff's proposed adverse action be reviewed by agency counsel for legal sufficiency. Specifically, Plaintiff asserts that "the HUD Adverse Action Handbook required HR to forward the draft disciplinary action for Dr. Jones to HUD-OGC because he was at the GS-14 grade level." [Dkt. 74 at 8]. Accordingly, Plaintiff argues, since the documents "would have been created 'in substantially similar form' regardless of the litigation, work production protection is not available." *Boehringer*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 138).

That issue appears to be more complex than Plaintiff admits. Here, the Associate General Counsel for the Office of Ethics and Personnel Law in HUD-OGC has averred that the agency's Adverse Action Handbook requires legal sufficiency review for only some of the types of administrative actions at issue—namely, proposals to take adverse action, but not final decisions of proposed adverse action. [Dkt. 73-3, ¶ 3]. The Court need not resolve that factual issue, however, because Defendant's work-product claims fail for a more fundamental reason: the agency has not shown that any of the attorneys involved in the creation of the documents at issue believed at the time that litigation was a real possibility. In this Circuit, "[f]or a document to meet [the anticipation of litigation] standard, the lawyer must at least have had a *subjective belief* that litigation was a real possibility, and that belief must have been objectively reasonable." *In re Sealed Case*, 146 F.3d at 884 (emphasis added); *accord Nat'l Ass'n of Criminal Def. Lawyers v. Dep't of Justice Exec. Office for United States Attorneys*, 844 F.3d 246, 251 (D.C. Cir. 2016). It

13

is the proponent's burden to make that showing. *See Alexander*, 192 F.R.D. at 46 ("[T]he burden of showing that the materials were prepared in anticipation of litigation is on the party asserting the privilege." (quoting *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 41 (S.D.N.Y. 1984))); *United States v. KPMG LLP*, 237 F. Supp. 2d 35, 41 (D.D.C. 2002) (same); *see also In re Veiga*, 746 F. Supp. 2d 27, 34 (D.D.C. 2010) ("Where the proponent fails to adduce sufficient facts to permit the court to conclude with reasonable certainty that the privilege applies, its burden is not met."). Here, the agency has failed to do so.

Indeed, Defendant's initial response to the motion to compel provided no declarations from the attorneys who actually created the documents at issue, leaving the Court with an insufficient basis on which to evaluate Defendant's bald assertion that the documents were created in anticipation of litigation. *Cf. In re Sealed Case*, 146 F.3d at 885–86 (counsel submitted uncontested affidavits demonstrating the factual basis for their belief that the documents in question were prepared in anticipation of litigation). Nevertheless, as has been permitted in this district, the Court provided the government with a chance to cure this deficiency. *See, e.g.*, *English v. Washington Metro. Area Transit Auth.*, 323 F.R.D. 1, 15 (D.D.C. 2017) (providing "a second opportunity to establish the applicability of the work product protection"); *In re Veiga*, 746 F. Supp. 2d at 40 n.15 (giving respondent multiple opportunities "to establish, with reasonable certainty, that the privileges against disclosure have been appropriately invoked"). However, despite the Court's instruction that Defendant submit declarations from the attorneys involved in the adverse actions at issue, it supplemented the record with only one. [Dkt. 72 at 71–72; Dkt. 73-3 (Decl. of Peter Constantine)]. And it makes no representation regarding the declarant's, or any other agency attorney's, subjective beliefs in the likelihood of litigation when the documents

at issue were created.     [Dkt. 73-3 (Decl. of Peter Constantine)].   If anything, Defendant's supplemental filings establish that the agency sought legal counsel from HUD-OGC not because litigation was reasonably anticipated, but as part of a "not unusual" HUD-ELR practice to ensure, in the words of one declarant, "that [HUD-ELR was] on the right track from a legal perspective." [Dkt. 73-2, ¶¶ 7, 14].

Accordingly, the Court finds that Defendant has failed to meet its burden with respect to establishing the work-product protection for any of the documents on the second revised privilege with the exception of six which were indisputably created by counsel during the pendency of *actual* litigation.   Specifically, work-product protection is properly invoked as to item 105 on the second revised log, which is Defendant's draft response to discovery served in D.B.'s MSPB case, and to items 111–114, and 116, which are Defendant's responses to discovery served in an EEO administrative case.   *See McPeek v. Ashcroft*, 202 F.R.D. 332, 339 (D.D.C. 2001) (finding that "a lawyer's work responding to a specific claim of [discrimination] filed with an agency EEO office" is created "in anticipation of litigation"); *Willingham v. Ashcroft*, 228 F.R.D. 1, 5 (D.D.C. 2005) (protecting documents created by counsel during EEO administrative proceedings).

While not upholding work-product protection for the remaining documents may be strong medicine, the government has had multiple chances to make the necessary showing.   Even after being directed by the Court to do so, it did not.   Defendant will not be permitted another opportunity to meet its burden.   *Cf. English*, 323 F.R.D. at 15–16 (requiring production of all documents over which work-product protection was claimed where proponent did not present facts supporting application of the privilege but relied on "conclusory statements, generalized assertions, and unsworn affidavits of its counsel" (quoting *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 127 (D.D.C. 2012))); *In re Veiga*, 746 F. Supp. 2d at 40 n.15 (noting that

proponent of work-product doctrine failed to carry burden of establishing protection despite being afforded multiple opportunities to do so); *Zelaya v. UNICCO Serv. Co.*, 682 F. Supp. 2d 28, 38 (D.D.C. 2010) (proponents' failure to provide sufficient information to sustain their burden of proof compelled disclosure of documents listed on privilege log).

Accordingly, the Court will order the production of the two documents on the second revised privilege log for which only the work-product protection is invoked as a basis for the withholding—items 5 and 76.[9] For every other item on the second revised privilege log, Defendant also invokes attorney-client privilege, the sufficiency of which the Court now turns.

### C.    Application of Attorney-Client Privilege

Unlike the work-product doctrine, the attorney-client privilege is not limited to material created in anticipation of litigation.  Rather, the privilege encompasses "all situations in which an attorney's counsel is sought on a legal matter."  *Coastal States*, 617 F.2d at 862.  It applies not only to communications between lawyers and clients "when lawyers represent their clients in litigation," but also to such communications "when the lawyers act in a counseling and planning role."  *Ideal Elec. Co. v. Flowserve Corp.*, 230 F.R.D. 603, 607 (D. Nev. 2005).  Thus, Defendant's failure to establish that the documents at issue were created in anticipation of litigation does not preclude the invocation of the attorney-client privilege to protect them from disclosure.  On that point, at least, the parties agree.

---

[9] Item 76 is a draft settlement agreement, thus suggesting that some matter may be in, or near, litigation.  Nevertheless, courts have required the disclosure of such draft settlement agreements where, as here, "[p]laintiffs have failed to offer any explanation as to how [the] drafts of settlement and mediation agreements were prepared 'in anticipation of litigation.'" *Bradfield v. Mid-Continent Cas. Co.*, 15 F. Supp. 3d 1253, 1256 (M.D. Fla. 2014); *see also Redding v. ProSight Specialty Mgmt. Co., Inc.*, No. CV 12-98-H-CCL, 2014 WL 11412743, at *6 (D. Mont. July 2, 2014) ("[T]he Court doubts whether this document was prepared in anticipation of litigation or for trial, since it clearly was prepared in anticipation of settlement.").

Some areas of their disagreement, however, merit further discussion before addressing Defendant's specific claims of privilege. First, Plaintiff contends that the "organic facts" or "percipient facts"—terms he does not define—contained in documents that are otherwise attorney-client privileged must be "segregate[d] out" from the otherwise privileged material in the documents and produced. [Dkt. 53 at 18; Dkt. 65 at 13; Dkt. 72 at 9, 18–19]. Plaintiff is incorrect. While it is often said that the privilege protects "only attorney-client communications themselves, not the underlying facts," *Fed. Trade Comm'n v. Boehringer Ingelheim Pharm.*, 180 F. Supp. 3d 1, 16 (D.D.C. 2016) (citing *Upjohn*, 449 U.S. at 395–96), the concept is more nuanced than the way that phrase is sometimes interpreted. In fact, "the attorney-client privilege protects not only legal advice, but the confidentially conveyed facts upon which that advice is based." *Pub. Emps. for Envtl. Responsibility v. U.S. Envtl. Prot. Agency*, 211 F. Supp. 3d 227, 233 (D.D.C. 2016). "Indeed, '[f]actual information provided by the client to the attorney is the essence of the privilege.'" *Id.* (alteration in original) (quoting *Vento v. I.R.S.*, 714 F. Supp. 2d 137, 151 (D.D.C. 2010). Thus, Plaintiff's repeated assertion that none of the facts in the documents he seeks came from an agency attorney misses the mark. [Dkt. 72 at 13; Dkt. 71-6 at 11]. What is protected by the privilege—indeed, what is the "essence of the privilege"—are the facts *provided by the client* to the attorney when he or she is seeking confidential legal advice.[10] *Pub. Employees for Envtl. Responsibility v. U.S. Envtl. Prot. Agency*, 211 F. Supp. 3d 227, 233 (D.D.C. 2016).

---

[10] Also unavailing is Plaintiff's related contention that "facts . . . made known to HUD OGC from other sources, such as the proposing official, deciding official, or HR" are not privileged because those facts came from "independent sources," a proposition for which he cites *In re Sealed Case*, 737 F.2d at 99, and *Smith v. Conway Org.*, 154 F.R.D. 73, 78 (S.D.N.Y. 1994). [Dkt. 53 at 14]. Indeed, it is "established that the attorney-client privilege may apply even where the relevant "legal advice concern[s] information originating with a third party." *Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 802 F. Supp. 2d 185, 201 (D.D.C. 2011); *see also Kellogg*, 756 F.3d at 760 (noting that legally-mandated investigations can enjoy protection from disclosure); *Banks v. Office of Senate Sergeant–at–Arms*, 228 F.R.D. 24, 27 (D.D.C. 2005) (communications merely apprising attorney of normal business developments to allow him to provide legal advice protected). Neither case cited by Plaintiff is to the contrary. *In re Sealed Case* actually recognizes that "advice prompted by the client's disclosures may be further and inseparably informed by other

To be sure, mere disclosure of facts from a client to his attorney does not make those facts "secret" or privileged going forward. But if facts are disclosed as part of a confidential attorney-client communication, then while those facts can be discovered independently, they may not be discovered through the communications that were made to the attorney. *See, e.g.*, *Pub. Emps. for Envtl. Responsibility*, 211 F. Supp. 3d at 233; *Willnerd v. Sybase, Inc.*, No. 1:09-CV-500-BLW, 2010 WL 5391270, at *3 (D. Idaho Dec. 22, 2010) ("Even if the privilege does not attach to the underlying fact, communications of that fact are privileged."). The best articulation of this fundamental (though sometimes misunderstood) distinction is found in *Upjohn*:

> A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, "What did you say or write to the attorney?" but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

449 U.S. at 395–96 (quoting *Philadelphia v. Westinghouse Electric Corp.*, 205 F. Supp. 830, 831 (E.D. Pa 1962)).[11]

---

knowledge and encounters." *In re Sealed Case*, 737 F.2d at 99. It makes clear that the privilege cloaks a communication from attorney to client "based, *in part at least*, upon a confidential communication [to the lawyer] from [the client].'" *Id.* at 99 (alterations in original) (quoting *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980)). Similarly, in *Smith*, the district court indicated that memoranda provided by a corporate employee to the company's attorney that were simply compilations of documents created by a third party would not be protected. 154 F.R.D. at 78. That is, *Smith*, holds merely that a communication comprised entirely of information from a third party is not privileged. *Id.* In any event, Plaintiff's assertion that HUD officials are somehow "independent sources" of information from the perspective of HUD-OGC is simply wrong. *See, e.g.*, *Banks*, 222 F.R.D. at 3 ("An attorney-client relationship may exist between an institution or organization and its counsel. A corporation may claim an attorney-client privilege for confidential communications made by its employees to corporate counsel in order to permit counsel to render legal services or legal advice to the corporation. There is no doubt that government agencies have the same privilege.").

[11] It is worth noting that Plaintiff's notion that factual material must be "segregate[d] out" from any attorney-client communication at issue is also incorrect. [Dkt. 72 at 18–19]. For this proposition, he relies on Freedom of Information Act ("FOIA") cases where courts have ordered that "non-exempt portions [of documents] must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). However, as the D.C. Circuit has recognized, the "reasonable segregability" requirement is a creature of the FOIA statute: "[i]n 1974, Congress expressly incorporated [the] requirement into the FOIA." *Id.*; *see* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."). FOIA's statutory reasonable segregability requirement has no application here. This is not a FOIA case. Indeed, Plaintiff's argument is suspect

Here, the government has asserted no "blanket privilege" over the facts.  Defendant has provided Plaintiff the final adverse actions at issue, along with the full Report of Investigation from HUD's OIG of Plaintiff's conduct.  [Dkt. 62 at 17].  Further, Plaintiff was free to question the agency employees whose communications are at issue concerning their understanding of the facts.

Second, Plaintiff also misconstrues a line from *Fisher v. United States*, 425 U.S. 391 (1976), wherein the Supreme Court stated that the attorney-client privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." *Id.* at 403.  That sentence expresses the uncontroversial principles that the privilege's purpose is "to encourage clients to make full disclosure to their attorneys," *id.* at 403, and that not all communications between an attorney and client are protected, but only those seeking legal advice.  *See, e.g.*, *Clarke v. Am. Commerce Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992); *In re Grand Jury Subpoenas*, 803 F.2d 493, 496 (9th Cir. 1986), *opinion corrected*, 817 F.2d 64 (9th Cir. 1987); *see also Ideal Elec. Co.*, 230 F.R.D. at 607.  That is, the cited line from *Fisher* merely recognizes that the privilege encourages frank and free communication that might not otherwise have been made and thus allows clients to receive reliable legal advice so they can conform their conduct to legal requirements.  *See, e.g.*, *New York Times Co. v. U.S. Dep't of Justice*, __ F. Supp. 3d __, __, 2017 WL 4772406, at *4 (D.D.C. 2017) ("Without a guarantee of confidentiality, executive branch agencies, like all legal clients, would hesitate to share private details about planned agency actions with [counsel] when seeking legal advice.   And without such

---

even in the FOIA context.  *See, e.g.*, *Judicial Watch, Inc. v. Department of Justice*, 432 F.3d 366, 371 (D.C. Cir. 2005) (holding that "[i]f a document is fully protected as [attorney] work product, then segregability is not required"); *Government Accountability Project v. U.S. Dept. of Justice*, 852 F. Supp. 2d 14, 27 n.4 (D.D.C. 2012) (concluding that, because attorney work-product protection applies, the court "need not consider whether any information in the documents was properly segregable").

confidentiality, executive branch agencies might choose to forgo seeking legal advice altogether and thereby risk public disclosure of private, confidential details about their activities. This would undermine the public interests that buttress the attorney-client privilege, since executive agencies seeking out legal advice concerning their planned activities helps ensure their actions conform to the law and the Constitution." (internal citations omitted)).

Plaintiff contends that the line from *Fisher* stands for the proposition that "[f]acts that would have been disclosed regardless of whether an attorney was consulted are not privileged." [Dkt. 53 at 12]. Specifically in this case, he argues that the privilege should not apply to any facts related to his proposed removal because there is some evidence that the HR Specialist responsible for drafting the proposed adverse action would have communicated with the agency's OIG, Office of the Chief Human Capital Officer ("OCHCO") staff, and the Deputy Secretary "to exchange [those] facts" regardless of whether HUD-OGC was involved in that process. [Dkt. 71-6 at 11–12; Dkt. 53 at 4–5; Dkt. 65 at 4; Dkt. 72 at 13 ("Whether or not the General Counsel's Office was going to be involved, the program officials would be communicating with the HR Specialists going back and forth on what the facts were.")].

Plaintiff's point is not entirely clear. [Dkt. 72 at 11–16]. He may mean to suggest that the attorney-client privilege has no application here because "the facts" concerning Plaintiff's alleged improper conduct would have been communicated between agency representatives "regardless of the involvement of HUD attorneys" given that there was an ongoing agency disciplinary process which inevitably would have required communications concerning those facts. [Dkt. 65 at 4, 12; Dkt. 53 at 6–7, 11–15]. This is incorrect. Proper application of the attorney-client privilege does not require a court to consider such imaginary scenarios. In this case, as part of the disciplinary process on which Plaintiff's argument relies, agency representatives *did in fact seek* legal counsel

multiple times concerning the proposed adverse actions at issue.  [Dkt. 73-2; Dkt. 73-5].  It is these communications that must be evaluated to determine if the privilege is applicable, not the possibilities Plaintiff imagines.

Similarly unavailing is his contention that the operative text from *Fisher* would preclude the privilege's application here because of "the fact that the OGC review process was a routine and mandatory part of all removals and disciplinary actions against high-level employees at HUD." [Dkt. 65 at 12].  *Fisher* imposes no such prohibition.  Again, it merely restates the black letter principle that it is only attorney-client communications concerning disclosures necessary to obtain legal advice that are protected by the privilege; it says nothing about, much less prohibits, routine or even mandatory legal reviews done pursuant to an agency's employee discipline policy.

Indeed, Plaintiff's reading of *Fisher* flies in the face of the D.C. Circuit's holding in *Kellogg.*  There, the Court of Appeals further clarified the "primary purpose test" used to determine whether an attorney-client communication was made for a legal as opposed to a business purpose.  756 F.3d at 757–60.  Importantly, the issue in *Kellogg* arose in the context of a corporate organization's internal investigation that was "conducted in order to comply with regulatory requirements and corporate policy and not just to obtain or provide legal advice."  *Id.* at 760.  The district court held, much like Plaintiff proposes here, that the attorney-client privilege did not apply because the proponent of the privilege had not shown that "the communication would not have been made 'but for' the fact that legal advice was sought."  *Id.* at 759 (quoting *United States ex rel. Barko v. Halliburton, Co.*, 4 F. Supp. 3d 162, 166 (D.D.C. 2014).  Instead, the district court concluded that the internal investigation was "undertaken pursuant to regulatory law and corporate policy rather than for the purpose of obtaining legal advice."  *Id.* (quoting *United States ex rel. Barko v. Halliburton Co.*, 37 F. Supp. 3d 1, 5 (D.D.C. 2014).  The Court of Appeals rejected a

strict "but for" analysis under which a communication would not be deemed privileged if there was any purpose behind it other than seeking or providing legal advice. *Id.* at 759. According to the D.C. Circuit, "[i]f one of the significant purposes of the internal investigation [is] to obtain or provide legal advice, the privilege will apply. That is true regardless of whether an internal investigation was conducted pursuant to a company compliance program required by statute or regulation, or was otherwise conducted pursuant to company policy." *Id.* at 760.

So too here. The fact that the legal reviews performed in this case were made pursuant to employee disciplinary procedures that may have been required by HUD's Adverse Action Handbook, is not dispositive of the privilege's application.  As long as one of the significant purposes of the communications at issue was the provision of legal advice or guidance, the agency will get the benefit of the privilege even with respect to its personnel decisions made consistent with an agency employee discipline policy. *See, e.g.*, *Gangi*, 97 M.S.P.R. at 176–78 (agency request for agency counsel's "legal opinion about the sufficiency of the draft proposal notice" was privileged, and was "not [a] request[] [for the agency counsel's] business opinion about whether the appellant's reduction in grade was advisable"); *see also United States ex rel. Fago v. M & T Mortgage. Corp.*, 238 F.R.D. 3, 11 (D.D.C. 2006), *abrogated on other grounds by Schmidt v. Solis*, 272 F.R.D. 1 (D.D.C. 2010) ("Although personnel decisions may generally be business decisions, that does not mean that M&T could not have sought and obtained legal advice about such decisions."); *Rehling v. City of Chicago*, 207 F.3d 1009, 1019 (7th Cir. 2000), *amended* (Apr. 4, 2000) (counsel's advice about employee's job placement and "the City's obligations under the [Americans with Disabilities Act]. . . . is exactly the kind of legal advice the privilege was meant to protect").

22

Having cleared the decks of these preliminary issues, the Court next evaluates Defendant's invocation of attorney-client privilege with respect to each item listed in the second revised privilege log. The Court will address first the drafts of the various adverse personnel actions at issue, which is the primary focus of Plaintiff's motion. [Dkt. 53 at 15]. Then it will analyze Defendant's invocation of the attorney-client privilege with respect to other documents—mostly emails and email attachments—that do not include drafts of the adverse personnel actions at issue.

### 1.       Draft Adverse Personnel Actions

The primary focus of Plaintiff's motion is HUD's assertion of privilege over drafts of proposed adverse personnel actions concerning four employees, Plaintiff, D.B., D.T., and S.C. [Dkt. 72 at 102]. These draft documents are items 35–43, 51–58, 61–62, 65–70, 89–90, 98–100, 102–04, 115, 118, 119–122, and 127, on the second revised privilege log.[12] [Dkt. 73-1].

By way of background, for each adverse action at issue, HUD-ELR issued two final documents: (1) the Notice of propose adverse action, which informs the employee of the agency's intent to bring an adverse action against them as well as his or her proposed charges on which the adverse action is based, and (2) the Decision on proposed adverse action, which is the agency's final decision with respect to the action. For each adverse action there was a Proposing Official, who proposed the action, and a Deciding Official, who made the final decision. The Proposing Official for Plaintiff's adverse action was Michelle Cottom, Plaintiff's supervisor, and the final Deciding Official for Plaintiff was Patricia Hoban-Moore.[13] As for D.B., the Proposing Official was Jerry Holloway and the Deciding Official was Dolores Cole. *Id.* The Proposing Official for

---

[12] Plaintiff also challenged item 117, but Defendant has since released that document in full, thus rendering the issue moot. [Dkt. 73-1].

[13] Because of the length of time Plaintiff's disciplinary proceedings were pending, there were two Deciding Officials who preceded Ms. Hoban-Moore, Estelle Richman and Dan Lurie, neither of whom took final action with respect to Plaintiff. [Dkt. 73-4].

D.T. was Michelle Cottom. The record before the Court does not identify D.T.'s Deciding Official, or either the Proposing or Deciding Officials for S.C.'s adverse action.

The agency's consideration of possible adverse personnel actions against Plaintiff and D.B. lasted approximately fourteen months between November 2010 and January 2012. [Dkt. 73-5, ¶ 4; Dkt. 73-1, Item 103]. During this time, there were two HUD-ELR HR Specialists who drafted the initial adverse action notices and decisions at issue; first, Margaret Harrison [Dkt. 73-5], and then upon her retirement, Michaela Bratten. [Dkt. 73-2, ¶ 3]. Barbara Eggleston was the HR Specialist for D.T.'s adverse action, and Anita Crews was the HR Specialist for S.C. [Dkt. 73-1, Items 115, 118]. Ms. Harrison, Ms. Bratten, Ms. Crews, and Ms. Eggleston's supervisors in HUD-ELR at various points during this period were Mark Zaltman, ELR Branch Chief; Holly Salamido, ELR Deputy Director; George Corsoro, ELR Director; James Reynolds, ELR Deputy Director and later Director; and Ruth Cook, ELR Deputy Director. [Dkt. 73-4]. The HUD-OGC attorneys who were consulted with respect to these adverse actions were Peter Constantine, Marsha Browne, Javes Myung, Cheryl Taylor, and Maxine Sharpe Wheatley. *Id.*

The government represents that it has produced in discovery all of the final adverse action notices and decisions at issue. It invokes the attorney-client privilege, however, with respect to drafts of these documents. For purposes of analysis, these documents are best divided into four categories: (1) communications between agency representatives and HUD-OGC attorneys requesting and/or receiving legal advice concerning the drafts of the adverse personnel actions at issue; (2) copies of drafts that Defendant claims were submitted to HUD-OGC for legal sufficiency review; (3) non-lawyer communications concerning the drafts made prior to any request for legal sufficiency review by HUD-OGC; and (4) non-lawyer communications concerning the drafts made after the provision of legal advice by HUD-OGC.

24

a.   *Communications with HUD-OGC Both Seeking and Providing Legal Advice Regarding Drafts*

The most straightforward category of documents for purposes of privilege analysis are the communications from the HR Specialists to HUD-OGC attorneys seeking legal advice concerning the sufficiency of the draft adverse actions (which were attached to those communications), and HUD-OGC's responses thereto providing the legal advice requested.  Items 39, 40, 42, 56, 69, 90 115, 122, and 127 fall into the former category; items 41, 43, 57, 70, 102–04, and 118 fall into the latter.  [Dkt. 73-1].  Each of the legal sufficiency review memoranda, with one exception,[14] is marked "CONFIDENTIAL—SUBJECT TO ATTORNEY/CLIENT PRIVILEGE."

Confidential communications from agency representatives to agency counsel requesting legal sufficiency review of draft proposed adverse personnel actions, and agency counsel's responses thereto providing that advice or making further inquiries necessary to the provision of it, are plainly protected by the attorney-client privilege.  *See Pub. Employees for Envtl. Responsibility*, 211 F. Supp. 3d at 230 ("The attorney-client privilege protects confidential communications from client to attorney, and from attorney to client."); *Lolonga-Gedeon v. Child & Family Servs.*, No. 08-CV-00300A(F), 2012 WL 1714914, at *5 (W.D.N.Y. May 15, 2012) (noting that an email from the client, a human resources director, to her outside counsel seeking legal advice is protected by attorney-client privilege).  Here, the advice requested and provided was plainly legal in nature and not for a business purpose.  According to the HUD-OGC counsel primarily responsible for reviewing the draft adverse personnel actions at issue, "legal sufficiency

---

[14] Item 57 does not include a privilege warning header.  This seems to have been an oversight HUD-OGC, as the document is plainly a legal sufficiency memorandum sent from HUD-OGC to an HUD-ELR HR Specialist.  However, this confidentiality designation is not controlling.  *See United States ex rel. Barko v. Halliburton Co.*, 74 F. Supp. 3d 183, 191 n.25 (D.D.C. 2014).

review" in this context consists of "an analysis of the charged misconduct based on the record to determine (1) if the legal elements are met, which includes a review of applicable law; (2) if the charge is appropriate; and (3) whether the penalty is reasonable under the *Douglas* factors[15] and supported by the record."  [Dkt. 73-3, ¶ 6].  *In camera* review confirms that this is an accurate description of the legal sufficiency reviews performed by HUD-OGC counsel with respect to the adverse personnel actions at issue.  The agency was seeking a legal opinion about the sufficiency of the draft proposed actions, not requesting a business or policy opinion about whether the proposed discipline was advisable.  Thus, the *Kellogg* "primary purpose" test is easily satisfied: the communications were for the purpose of securing primarily a legal opinion that concerned the legal sufficiency of proposed agency action.  756 F.3d at 760.  Further, based on *in camera* review, the Court finds that the legal advice was also based, at least in part, on information provided by an agency representative and not an independent source.  *In re Sealed Case*, 737 F.2d at 99.

As an alternate basis for the withholding of all but two of these drafts, a side-by-side comparison of the preliminary drafts included in items 39, 40–43, 56–57, 69–70, 102–04, 118, 122, and 127 with the final versions of the adverse personnel actions at issue—all of which the government represents were produced in discovery—would likely reveal the legal advice of HUD's counsel.[16]  As this Court found in *Boehringer*, "[a]lthough '[d]rafts, standing alone, are not "communications" and hence normally are not within the attorney-client privilege,' they can be protected 'if the draft itself contains protected confidential communications from the client or the attorney.'  In other words, the same basic principles apply to draft documents as to documents

---

[15] *See Douglas v. Veterans Administration*, 5 M.S.P.R. at 305 (1981) (establishing the criteria that must be considered in determining an appropriate penalty to impose for an act of employee misconduct).

[16] Defendant did not provide the Court with the final versions of D.T.'s proposed reduction in grade, so no *in camera* comparison could be done between those versions and the drafts included in items 90 and 115.

finally communicated to someone else." 180 F. Supp. 3d at 34 n.9 (second alteration in original) (internal citation omitted) (quoting *Loftin*, 258 F.R.D. at 35). Specifically, "a draft is protected under the attorney-client privilege if the draft itself contains protected confidential communications from the client or the attorney." *Loftin*, 258 F.R.D. at 35; *see also Se. Pa. Transit Auth. v. Caremark PCS Health, L.P.C.*, 254 F.R.D. 253, 258 (E.D. Pa. 2008) ("Preliminary drafts of contracts are generally protected by attorney-client privilege, since '[they] may reflect not only client confidences, but also legal advice and opinions of attorneys, all of which is protected by the attorney/client privilege.'") (alteration in original) (quoting *Muller v. Walt Disney Prods.*, 871 F. Supp. 678, 682 (S.D.N.Y 1994))). Here, *in camera* comparison of the draft adverse personnel actions with their final versions reveal that changes were made to the final versions that were based on the legal advice received from HUD-OGC. The Court upholds the withholding of the drafts included in items 39, 40–43, 56–57, 69–70, 102–04, 118, 122 and 127 to safeguard against the disclosure of that privileged information. *See Alexander v. F.B.I.*, 186 F.R.D. 154, 161 (D.D.C. 1999) ("The attorney-client privilege must . . . 'ensure against inadvertent disclosure, either directly or by implication.'"); *Tri-State Hosp. Supply Corp. v. United States*, No. CIV.A. 00-1463HHK/JMF, 2005 WL 3447890, at *4 (D.D.C. Dec. 16, 2005) (upholding assertion of attorney-client privilege where documents "reveal confidential communications").

Moreover, having reviewed each document, the Court finds that the agency's communications with counsel were not made for the purposes of committing a crime or a tort, and that Defendant has not waived the privilege as to these communications. The Court also finds that these agency communications with counsel were made and maintained in confidence, as each email, with two exceptions, reflects communications *directly between* HUD-OGC and the HUD

employees who had specific authority for drafting the adverse personnel actions at issue, including the HR Specialist and her supervisors.

Two documents—items 122 and 127—require some further discussion. Item 122 is a December 15, 2010 email between two non-attorneys, HR Specialist Harrison and one of her supervisors, Mark Zaltman, who was the ELR Branch Chief. [Dkt. 73-1, Item 122]. In the email, Ms. Harrison forwarded to Mr. Zaltman a December 11, 2010 email that another supervisor had sent to HUD-OGC requesting legal advice concerning a draft of Plaintiff's Notice of Proposal to Remove, i.e., item 42. *Id.* Similarly, item 127 is a February 24, 2011 email from HR Specialist Harrison to Jerry Holloway, the Proposing Official for D.B's adverse personnel action. [Dkt. 73-1, Item 127]. The email attaches a draft of D.B.'s Notice of Proposed Removal which two days earlier, Ms. Harrison had submitted to HUD-OGC for legal sufficiency review, i.e., item 56. *Id.*, Item 56. The question then arises whether the HR Specialist's forwarding to her supervisor and the Proposing Official drafts previously submitted to HUD-OGC for legal sufficiency review vitiated the privilege with respect to those drafts.

It did not. In this Circuit, circulation of an otherwise privileged communication between corporate employees will not waive the privilege provided the "the documents were distributed on a 'need to know' basis or to employees that were 'authorized to speak or act' for the company." [17]

---

[17] This proposition has been expressed in other jurisdictions as the "need to know" test. *See, e.g.*, *Deel v. Bank of America, N.A.*, 227 F.R.D. 456, 460 (W.D. Va. 2005) ("A corporation does not waive its privilege when non-lawyer employees send or receive communications because corporate communications which are shared with those having need to know of the communications are confidential for purposes of the attorney-client privilege"); *Wrench LLC v. Taco Bell Corp.*, 212 F.R.D. 514, 517 (W.D. Mich. 2002) ("[W]hile corporate executives may share legal advice with lower-level corporate employees without waiving the privilege, the privilege extends only to those employees with a 'need to know,' including those employees with general policymaking authority and those with specific authority for the subject matter of the legal advice"); *Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.*, 174 F.R.D. 609, 633 (M.D. Pa. 1997) ("Communications between corporate counsel and company personnel . . . retain their privileged status if the information is relayed to other employees of officers of the corporation on a need to know basis. Only when the communications are relayed to those who do not need the information to carry out their work or make effective decisions on the part of the company is the privilege lost"); *Robbins & Myers, Inc. v. J.M. Huber Corp.*, 274 F.R.D.

*F.T.C. v. GlaxoSmithKline*, 294 F.3d 141, 147 (D.C. Cir. 2002) (first quoting *F.T.C. v. GlaxoSmithKline*, 203 F.R.D. 14, 18 (D.D.C. 2001), then quoting *Coastal States*, 617 F.2d at 863). The burden on the party claiming privilege is to "show that it limited its dissemination of the documents in keeping with their asserted confidentiality, not to justify each determination that a particular employee should have access to the information therein." *Id.* As the D.C. Circuit has explained:

> [W]e can imagine no useful purpose in having a court review the business judgment of each corporate official who deemed it necessary or desirable for a particular employee or contractor to have access to a corporate secret. It suffices instead that the corporation limited dissemination to specific individuals whose corporate duties relate generally to the contents of the documents.

*Id.* at 148. This same principle is applicable to the circulation of privileged material within government agencies. *See Alexander*, 186 F.R.D. at 162; *see also Mead Data Cent. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253 n.24 (D.C. Cir. 1977). Here, the government has met this burden with respect to items 122 and 127 as both reflect limited dissemination of the privileged drafts only to the HR Specialist's supervisor or to the Proposing Official responsible issuing the proposed adverse personnel action at issue. *See Pub. Employees for Envtl. Responsibility*, 211 F. Supp. 3d at 233 n.3 (dissemination of confidential information within employee's "chain of command" does not waive the privilege). Accordingly, the Court finds that the privilege was not waived as to either document.

Accordingly, Defendant's invocation of attorney-client privilege is upheld as to items 39, 40–43, 56–57, 69–70, 90, 102–04, 115, 118, 122, and 127.

---

63, 94 (W.D.N.Y. 2011) (dissemination of confidential and privileged information to persons within an organization not shown to have a need to know such information waives the attorney-client privilege).

> **b.**     *Copies of Drafts Defendant Claims Were Submitted to HUD-OGC for Legal Sufficiency Review*

The next category consists of drafts of the adverse personnel actions at issue that Defendant contends were sent to HUD-OGC for legal sufficiency review, although there are no transmittal memoranda to HUD-OGC clearly indicating that transmission.  Items 58, 61, 62, 89, 98–100, and 119 fall into this category.  The Court finds that items 58, 61, 98–100, and 119 are protected by the privilege but that items 62 and 89 are not.

Again, "a draft is protected under the attorney-client privilege if the draft itself contains protected confidential communications from the client or the attorney."  *Loftin*, 258 F.R.D. at 35; *see also Se. Pa. Transit Auth.*, 254 F.R.D. at 258 (E.D. PA 2008).  Consistent with that principle, Defendant argues that each of the "stand alone" drafts in this category are duplicates of the "information" that agency representatives communicated confidentially to HUD-OGC for purposes of legal review, and that comparison of the drafts to the final versions of the adverse actions—produced to Plaintiff in discovery—would effectively disclose the legal advice provided by HUD-OGC with respect to the drafts.   The Court finds the legal principles on which Defendant's argument is based are sound.  *See Sec. & Exch. Comm'n v. Texas Int'l Airlines, Inc.*, 29 Fed. R. Serv. 2d 408, 408, 1979 WL 184774, at *1 (D.D.C. 1979) ("[W]hen a client sends a draft to an attorney for review, his intention is to make public only such information as appears appropriate for publication in the context of and according to the lawyer's advice."); *Loftin*, 258 F.R.D. at 35 ("[A] draft is protected under the attorney-client privilege if the draft itself contains protected confidential communications from the client or the attorney.").  The question is whether the government has in fact proven that the drafts at issue are the same as the versions sent to HUD-OGC for legal sufficiency review and whether their later dissemination outside of HUD-OGC

undermined the confidentiality required for invocation of the privilege. *See Brinton v. Dep't of State*, 636 F.2d 600, 603 (D.C. Cir. 1980), *cert denied*, 452 U.S. 905 (1981).

Turning to the documents, items 98–100 are drafts of Plaintiff's Decision on Proposal to Remove and are identical to one another. [Dkt. 73-1, Items 98–100]. HR Specialist Bratten avers that these documents are copies of the version of the draft that she sent to HUD-OGC for legal sufficiency review on December 23, 2011. [Dkt. 73-2, ¶ 14]. She is able to so identify item 100 because it reflects her handwriting in the top corner which states "at OGC 12/23/11." *Id.* She also avers that she sent an identical copy of the draft to her supervisor (item 98) and to the Deciding Official (item 99) on that same date. *Id.* In fact, Ms. Bratten's emails to her supervisor and the Deciding Official state that she had sent the attached drafts (items 98 and 99) to HUD-OGC for legal sufficiency review. [Dkt. 73-1, Items 98, 99]. The Court finds this contemporaneous evidence sufficient to prove that items 98–100 are copies of the version of Plaintiff's Decision on Proposal to Remove that was sent to HUD-OGC for legal review.

Similarly, item 61 is a draft of the Notice of Proposed Removal for D.B. [Dkt. 73-1, Item 61]. Plaintiff asserts that it is the same draft submitted to HUD-OGC for legal review by Ms. Bratten on March 17, 2011, i.e., item 59 discussed above. The government has not submitted the draft that is referenced in Ms. Bratten's March 17, 2011 transmittal email, so no comparison between that draft and item 61 can be made. Read in context, Ms. Bratten's email is referring to an attached draft of D.B.'s Notice of Proposed Removal. In the email, Ms. Bratten asks the HUD-OGC counsel to whom the email is sent to "please take a look at the attached document—specifically the highlighted areas." [Dkt. 73-1, Item 59]. The "highlighted" section of the draft is then described in the email. *Id.* Item 61 is in fact a highlighted draft of D.B.'s Notice of Proposed Removal, and the highlights in the draft correspond to the description in the email. [Dkt. 73-1,

Item 61].  Accordingly, the Court is satisfied that the item 61 is a copy of the draft of the Notice of Proposed Removal that was attached to item 59 and sent to HUD-OGC for legal review.

Establishing that items 58 and 119 are the same draft versions as those sent to HUD-OGC for legal review is more straightforward.  Item 58 is a copy of a draft of D.B.'s Notice of Proposal to Remove.  [Dkt. 73-1, Items 58].  Upon *in camera* review, item 58 is in fact identical to the draft sent to HUD-OGC on February 22, 2011 for which the government has provided the transmittal communication to HUD-OGC—i.e., item 56 discussed in the category above.  [Dkt. 73-1, Items 56, 58].  Similarly, item 119 contains multiple draft versions of Plaintiff's Notice of Proposal to Remove which are identical to the drafts sent to HUD-OGC for legal sufficiency review on November 8 and November 9, 2010 for which the government has provided the transmittal communications to HUD-OGC, i.e., items 39 and 40 discussed above.  [Dkt. 73-1, Items 39, 40, 119].

The Court also finds that all these documents were maintained in confidence as required to sustain the privilege.  Here, both Ms. Bratten and Ms. Harrison have averred to the confidential treatment generally accorded such documents within HUD, which this Court has no reason to doubt with respect to items 58, 61, 98–100, or 119.  [Dkt. 73-2, ¶ 15; Dkt. 73-5, ¶¶ 4-7].  It appears that item 61 was only sent to HUD-OGC.  [Dkt. 73-1, Items 59, 61].  Review of the emails associated with items 98–100 shows that other than HUD-OGC the drafts were circulated only to the Deciding Official and Ms. Bratten's supervisor, individuals with specific authority with respect to the adverse personnel action at issue.  [Dkt. 73-1, Items 98–100].  Similarly, the copies of the drafts included in item 119 were circulated only to Ms. Harrison, her supervisor, and the Proposing Official.  [Dkt. 73-1, Item 119].

As for the copy of the draft identified as item 58, Ms. Bratten claims it as her own; it does not appear to have been circulated at all. [Dkt. 73-2, ¶ 5]. It exists because Ms. Bratten reviewed it to "familiarize [herself] with the issues in the case" when she took over as the HR Specialist responsible for D.B.'s personnel action in early March 2011 after the prior HR Specialist—Ms. Harrison—retired. [Dkt. 73-2, ¶¶ 3, 6]. Ms. Bratten is able to identify the draft as that document from a handwritten note that she placed on it "reflect[ing] information that [she] received from Mr. Holloway [the Proposing Official for D.B.'s adverse action] on March 16, 2011." [Dkt. 73-2, ¶ 6]. Accordingly, the Court finds that items 58, 61, 98–100, and 119 were maintained in confidence by the agency as required to sustain the privilege.

Having found that items 58, 61, 98–100, and 119 are copies of drafts that were communicated to HUD-OGC for purposes of obtaining legal advice, and that they were otherwise maintained in confidence by the agency, the Court consequently finds that each of these items is protected by the attorney-client privilege. Alternatively, the Court also finds, upon *in camera* review, that a comparison of the drafts that constitute items 58, 61, 98–100, and 119 with the final versions of the adverse personnel actions issued to the subject employee, would reveal changes made to the drafts based on the legal advice of HUD's counsel, thereby revealing that privileged advice. Thus, these documents are properly withheld under the attorney-client privilege for this reason as well. *See Loftin*, 258 F.R.D. at 35 ("[A] draft is protected under the attorney-client privilege if the draft itself contains protected confidential communications from the client or the attorney.").

Less successful is Defendant's showing with respect to items 62 and 89. Item 89 is a "stand alone" draft of D.T.'s Notice of Proposed Reduction in Grade without any transmittal memorandum, whether to HUD-OGC or anyone else. [Dkt. 73-1, Item 89]. None of Defendant's

supplemental declarations address it (or, for that matter, any of the documents related to D.T.'s adverse personnel action). Defendant baldly asserts in the second revised privilege log that item 89 is a "[d]raft . . . subsequently conveyed to counsel . . . for legal advice." *Id.* As support for this statement Defendant cites to item 90 which is in fact the request for legal sufficiency review of D.T.'s Notice of Proposed Reduction in Grade sent to HUD-OGC on December 16, 2011. *Id.*, Item 90. But item 89 is not the same draft as item 90. Defendant also relies on a handwritten note at the top of item 89 that reads "to OGC 12/  /11." *Id.*, Item 89. Defendant does not indicate what the notation means or even who wrote it. The Court finds that this notation is too ambiguous to support a claim of privilege as to the document on which it was written. Accordingly, item 89 shall be produced to Plaintiff unredacted.

Defendant's showing with respect to 62 also fails. Item 62 is a "stand alone" draft of D.B's Notice Proposed Removal. [Dkt. 73-1, Item 62]. Defendant fails to show that it was submitted to HUD-OGC for purposes of legal review. Rather, Defendant contends in the second revised privilege log that item 62 is a draft that reflects edits directed by HUD-OGC counsel in a March 18, 2011 email, i.e., item 60. [Dkt. 73-1, Item 62]. But, as the Court finds below, those edits are merely typographical and do not reflect the provision of legal advice. Indeed, the HUD-OGC counsel who suggests the edits states in the March 18 email that her "comments do not affect the legal sufficiency of the proposal." Further, following *in camera* review, the Court can discern no substantive difference between item 62 and the final version of D.B's proposed removal—and certainly no changes that reflect the provision of legal advice. Indeed, perhaps the most significant difference between the final version of the notice of proposed removal and item 62 is the inclusion of a missing quotation mark. Accordingly, item 62 shall be produced to Plaintiff unredacted.

34

### c.   *Non-lawyer, Draft-related Communications Made Prior to Request for Legal Sufficiency Review by HUD-OGC*

The next category concerns communications between non-lawyer agency representatives relating to the draft adverse personnel actions but made prior to requests for legal sufficiency review of the drafts by HUD-OGC.  Items 35–38, 51–55, and 65–68 fall into this category.

Plaintiff challenges the invocation of the privilege for these drafts because they were sent among non-lawyer agency representatives.  But the attorney-client privilege is more nuanced than Plaintiff suggests.  It is well established that a "document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds." *Boehringer*, 180 F. Supp. 3d at 34 (D.D.C. 2016) (quoting *Santrade*, *Ltd. v. General Electric Co.*, 150 F.R.D. 539, 545 (E.D.N.C. 1993)); *MGA Entm't, Inc. v. Nat'l Prod. Ltd.*, No. CV 10-07083 JAK SSX, 2012 WL 3150532, at *4 (C.D. Cal. Aug. 2, 2012).  While "lack of any lawyer involvement in any particular communication [is] a factor tending to weigh against [a party] in showing the privileged nature of that communication," it "is not fatal to a claim of privilege." *United States v. Davita, Inc.*, 301 F.R.D. 676, 681–82 (N.D. Ga. 2014), *on reconsideration in part*, No. 1:07-CV-2509-CAP-JSA, 2014 WL 11531065 (N.D. Ga. May 21, 2014).

In this vein, courts have held "that communications among non-lawyer corporate personnel are protected if the dominant intent is to prepare the information in order to get legal advice from the lawyer." *In re New York Renu with Moistureloc Prod. Liab. Litig.*, No. CA 2:06-MN-77777-DCN, 2008 WL 2338552, at *10 (D.S.C. May 8, 2008); *see also e.g.*, *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1077 (N.D. Cal. 2002) (holding "internal communications that reflect matters about which the client intends to seek legal advice are protected"); *Havel v. Dentsu McGarry Bowen UK, Ltd.*, No. CIV.A. H-13-1291, 2015 WL 409837, at *3 (S.D. Tex. Jan. 29, 2015) (the "dominant intent" of three attorney-client privileged emails

was "to prepare the information in order to get legal advice from the lawyer"); *Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, No. 2:07-CV-1190, 2010 WL 5014483, at *2 (S.D. Ohio Dec. 3, 2010) ("the key question" in such cases is whether the "dominant intent is to prepare the information in order to get legal advice from the lawyer"); *AT&T Corp. v. Microsoft Corp.*, No. 02–0164, 2003 WL 21212614, at *3 (N.D. Cal. Apr. 18, 2003) ("Communications containing information compiled by corporate employees for the purpose of seeking legal advice and later communicated to counsel are protected by attorney-client privilege."). The rationale for protecting this type of non-lawyer communications is straightforward:

> Materials, transmitted between nonlawyers, that reflect matters about which the client intends to seek legal advice are comparable to notes a client would make to prepare for a meeting with her lawyer-notes which could serve as an agenda or set of reminders about things to ask or tell counsel. It would undermine the purpose of the attorney-client privilege not to extend protection to such notes. Therefore, internal communications that reflect matters about which the client intends to seek legal advice are protected.

*ChevronTexaco Corp.*, 241 F. Supp. 2d at 1077.

In *Havel*, for example, the district court upheld the privilege with respect to three e-mails communicated between non-attorneys that expressly mentioned seeking legal counsel, noting that the "dominant intent" of the communications was to obtain legal advice. 2015 WL 409837, at *3. Similarly, in *AT&T Corp.* the court upheld the attorney-client privilege as to emails among corporate employees containing analysis and discussion of AT&T's patents, matters upon which the employees intended to, and did in fact, seek legal advice. 2003 WL 21212614, at *1, *3. Because the emails contained "[c]ommunications between non-lawyer employees about matters which the parties intend to seek legal advice" and "were never produced to anyone outside of [the company], except for outside counsel," the court held they were protected by the attorney-client privilege.

This principle is consistent with this District's treatment of drafts with respect to privilege. In *Sec. & Exch. Comm'n v. Texas Int'l Airlines, Inc.*, this Court held that "when a client sends a draft to an attorney for review, his intention is to make public only such information as appears appropriate for publication in the context of and according to the lawyer's advice." 29 Fed. R. Serv. 2d at 408, 1979 WL 184774, at *1; *see also Alexander*, 198 F.R.D. at 312 ("Drafts of documents that are prepared with the assistance of counsel for release to a third party are protected under attorney-client privilege.").

The same reasoning and principles should apply in the context of a government agency. "Agencies, like corporations, can act only through their agents or representatives," *Gangi*, 97 M.S.P.R. at 177, and those agency representatives should receive protection under the privilege commensurate to that allowed their private counterparts. If an agency "is dealing with its attorneys as would any private party seeking advice to protect personal interests, [then it] needs the same assurance of confidentiality so [that] it will not be deterred from full and frank communications with its counselors.'" *General Elec. Co.*, 2006 WL 2616187, at *15 (alterations in original) (quoting *In re Lindsey*, 158 F.3d at 1269).

Applying these principles here, the Court finds that the communications between non-lawyer agency representatives exchanging the draft adverse personnel actions at issue are protected by the attorney-client privilege. The record reveals that the agency representatives involved with these communications intended that the drafts would be submitted to HUD-OGC for legal sufficiency review prior to transmitting the notices or decisions to the subject employee. Indeed, HUD's Adverse Action Handbook *required* that a notice of proposed removal from federal service be reviewed for legal sufficiency by HUD-OGC prior to issuing the notice to the subject employee.

[Dkt. 73-3, ¶ 3].  HUD-ELR adhered to that requirement with respect to both D.B.'s and Plaintiff's notices.

Items 51–55, for example, are emails sent among non-lawyer HUD employees attaching drafts of D.B.'s Notice of Proposed Removal.  The HR Specialist, Ms. Harrison, expressly stated in the emails attaching the drafts that she would submit the final draft for legal sufficiency review after she had incorporated any changes from her supervisors and the Proposing Official, who were sent the emails.  Specifically, Ms. Harrison emailed her initial draft of the proposed removal to her HUD-ELR supervisors for review and comment on February 7, 2011.  [Dkt. 73-1, Item 51].  In the unredacted email accompanying this draft, Ms. Harrison noted that her next step was to send it to the Proposing Official for review and then to HUD-OGC for legal sufficiency review.  *Id.*  On February 9, 2011, she sent the draft to the Proposing Official for review, noting again that she intended to send it to HUD-OGC for legal sufficiency review.  *Id.*, Item 52.  The Proposing Official approved the draft on February 14, and Ms. Harrison again asked her HUD-ELR supervisors if she could send the draft to HUD-OGC for legal sufficiency review.  *Id.*, Item 53.  Then, based on revisions requested from the HUD-ELR Director—which are outlined in the unredacted email— Ms. Harrison made further changes to the draft and submitted it on February 15 to her supervisors for approval to send to HUD-OGC.  *Id.*, Item 54.  On February 22, she sent her supervisors another email requesting their approval to send the draft to HUD-OGC.  *Id.*, Item 55.  She sent an identical draft of D.B.'s Notice of Proposed Removal to HUD-OGC later that day.  *Id.*, Item 56.

Similarly, items 35–38 are emails among non-lawyer HUD employees that attach drafts of Plaintiff's Notice of Proposed Removal.  *Id.*, Items 35–38.  The emails again clearly articulate the intent of the agency to submit the draft to HUD-OGC prior to issuing it to Plaintiff.  In a November 2, 2010 email for instance, Ms. Harrison stated that once "management" had decided on the penalty

and the specifications to include in the notice, that she would "forward the draft to OGC for legal sufficiency review (consistent with the Handbook 752.2, since this is an employee GS-14 or above)." *Id.*, Item 35. Six days later, on November 8, Ms. Harrison sent a revised draft of the notice to her supervisors, along with an email which again stated that she had received the "OK to send the draft removal proposal notice to OGC for legal sufficiency, which I'll do shortly," and that she would give it to the Proposing Official "at the same time, per [the Proposing Official's] wishes not to hold anything up." *Id.*, Item 36. Three hours later she forward the draft to the Proposing Official, *id.*, Item 37, on the same day that she submitted the draft to HUD-OGC for legal sufficiency review, *id.*, Item 39. The Proposing Official then further revised the draft on November 8, *id.*, Item 38, and one day later sent that revised version to HUD-OGC for legal review as well, *id.*, Item 40.

Items 65–68 concern drafts of D.B.'s Decision on Proposal to Remove. Although not required by the HUD Adverse Action Handbook, HR Specialist, Ms. Bratten, avers in her declaration that it was her intent to seek legal sufficiency review of the draft prior to its dissemination to D.B. "to ensure [the agency] was on the right track from a legal perspective." [Dkt. 73-2, ¶ 7]. And, indeed, her contemporaneous September 29, 2011 email to the Deciding Official stated that she would be sending that attached draft to HUD-OGC for legal sufficiency review, following any changes made by the Deciding Official. *Id.*, Item 68. Thereafter, Ms. Bratten incorporated edits and comments that she received from both the Deciding Official, and another experienced HR Specialist in HUD-ELR, and sent the revised version of the draft to HUD-OGC for legal sufficiency review on October 7, 2011. [Dkt. 73-2, ¶ 8; Dkt. 73-1, Items 66–67, 69]. After receiving legal guidance from HUD-OGC, Dkt. 73-1, Item 70, Ms. Bratten continued

to revise the draft based on that advice, *id.*, Item 65, and then sought further legal advice from HUD-OGC concerning the revised draft, *id.*, Item 72.  [Dkt. 73-2, ¶ 11].

Based on this record, the Court finds that items 35–38, 51–55, and 65–68 were drafted by agency representatives with the express intent that any draft would be sent to HUD-OGC for legal sufficiency review prior to being issued to the subject employee.  The Court further finds that the drafts were maintained in confidence during the drafting process and that, in each case, a revised version of the draft was in fact submitted to HUD-OGC for legal sufficiency review.  These drafts are therefore protected under the attorney-client privilege pursuant to the principles discussed above.

Alternatively, the Court also finds, upon *in camera* review, that a comparison of the drafts that constitute items 35–38, 51–55, and 65–68 with the final versions of the respective adverse personnel actions issued to the subject employee, would reveal changes made to drafts based on the advice of HUD's counsel, thereby revealing that privileged legal advice.  These documents are thus properly withheld under the attorney-client privilege for this reason, as well.  *See Loftin*, 258 F.R.D. at 35.

Further, the Court finds that the agency's communications with respect to items 35–38, 51–55, and 65–68 were made and maintained in confidence among agency representatives who had responsibility for the adverse personnel actions at issue, including the HR Specialists, their supervisors and/or experienced colleagues in HUD-ELR, and the Proposing and Deciding Officials.  *Id.*, Items 35–38, 51–55, 65–68; [Dkt. 73-3, ¶ 8 ("Given the sensitive nature of the personnel subjects at issue, it was the established practice of all involved with these client-OGC communications to limit discussion of these matters and circulation of related documentation and attorney work product to those who had a need to know."); Dkt. 73-2, ¶¶ 4, 6, 8–9, 11, 15; Dkt.

73-5, ¶¶ 4–9].   Indeed, the D.C. Circuit has permitted much wider circulation of otherwise privileged material than what occurred here.  *See GlaxoSmithKline*, 294 F.3d at 148 (extending privilege to communications the client shared with its public relations and government affairs consultants).

Finally, the Court finds that the communications were not made for the purposes of committing a crime or a tort, and that Defendant has not waived the privilege as to them. Accordingly, the Court finds that attorney-client privilege applies to items 35–38, 51–55, and 65–68 on the second revised privilege log.

d.      *Non-lawyer Communications Concerning Drafts Made After the Provision of Legal Advice by HUD-OGC*

The next category is the converse of the prior one.  It concerns communications between non-lawyer HUD employees *made after* HUD-OGC communicated its legal advice to the agency regarding the draft adverse personnel actions at issue.  Items 120 and 121 are emails that fall into this category.  Each attaches a draft that was revised by a HUD employee following the receipt of HUD-OGC's legal advice.

Like the documents in the prior category, Plaintiff challenges the invocation of the privilege for these drafts because the emails to which they were attached were exchanged among non-lawyers.  But, again, a "document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds." *Boehringer*, 180 F. Supp. 3d at 34 (quoting *Santrade*, *Ltd.*, 150 F.R.D. at 545).  One example, discussed above, concerns non-lawyer client communications made in confidence and with the intent to seek legal advice.  Another focuses on communications among non-lawyer client representatives following the receipt of legal advice.  It permits "documents subject to the privilege [to] be transmitted between non-attorneys . . . so that the corporation may be properly informed of legal advice and act appropriately."

*SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 477 (E.D. Pa. 2005) (alteration in original) (quoting *Santrade*, *Ltd.*, 150 F.R.D. at 545); *see also Evans v. Atwood*, 177 F.R.D. 1, 6 (D.D.C. 1997) ("[C]irculating truly confidential information among concerned officials does not defeat the privilege since all the recipients shared the attorney-client privilege with each other."); *Nesse v. Pittman*, 206 F.R.D. 325, 329 (D.D.C. 2002) (attaching privilege to non-attorney's notes summarizing information learned from attorney).

That was the case here with respect to items 120 and 121.  Both are emails sent on December 1, 2010, one ten minutes after the other, by HR Specialist Harrison to her supervisor, Mark Zaltman.  [Dkt. 73-1, Items 120, 121].  The emails attach a draft of a proposed disciplinary action against Plaintiff.  The transmittal email—produced in discovery—states that Ms. Harrison had revised the attached draft to reflect legal guidance received from HUD-OGC on a prior draft, and indicated that she would shortly be sending Mr. Zaltman the legal sufficiency memorandum if he had not already received it.  *Id.*  Read in context, it is plain that Ms. Harrison was providing the revised draft to her supervisor to inform him of the legal advice that had been received from HUD-OGC and to seek his input on the revised draft.  *Id.*  These documents are thus fairly characterized as communications made with the intent to keep a responsible agency representative informed of legal advice so that he and the agency could benefit from the guidance and act appropriately.  Further, the attached revised draft includes Ms. Harrison's written comments which expressly reflect the legal guidance received from HUD-OGC on an earlier draft.  *Id.*  The revised draft falls within the attorney-client privilege for this reason as well.  *See Loftin*, 258 F.R.D. at 35 ("[A] draft is protected under the attorney-client privilege if the draft itself contains protected confidential communications from the client or the attorney.").

Further, the Court finds that the agency's communications with respect to items 120 and 121 were made and maintained in confidence as they were only between Ms. Harrison and her supervisor.  [Dkt. 73-1, Items 120, 121].  Finally, the Court finds that the communications were not made for the purposes of committing a crime or a tort, and that Defendant has not waived the privilege as to them.  Accordingly, the Court finds that attorney-client privilege applies to items 120 and 121 on the second revised privilege log.

### 2.    Other Documents

Apart from the draft adverse action notices and decisions, Defendant invokes the attorney-client privilege with respect to eighty-five additional items, all of which are either emails or email attachments that Defendant has withheld in full or in part.  [Dkt. 73-1].  Although they are not the focus of his motion, Plaintiff nominally challenges Defendant's assertions of privilege to these documents as well.  Accordingly, the Court reviewed each of these items *in camera*.

Following that review, the Court finds that the withheld documents (or redactions to documents) are protected from disclosure under the attorney-client privilege, with the exception of items 5–8, 10–12, 20, 23, 25, 28–30, 32–33, 59–60, 63, 74, 78–80, 106–110 as further described in the chart below.[18]  [Dkt. 73-1].  With those exceptions, the Court otherwise finds that the documents at issue (1) reflect confidential communications between agency representatives and agency attorneys; made (2) with a "significant purpose" of obtaining or providing legal advice or counsel, *Kellogg*, 756 F.3d at 760, that is, the advice or counsel was related to "some legal strategy, or to the meaning, requirements, allowances, or prohibitions of law," *Gen. Elec. Co.*, 2006 WL 2616187, at *15; that the communications (3) were made either (i) to convey information obtained

---

[18] The Court's determination that Defendant has failed to establish the basis for work-product protection also applies to each of these items with the exceptions, as noted above, of items 105, 111–14, and 116.

from agency representatives to agency attorneys necessary to the provision of the legal advice sought, or (ii) to convey the legal advice which was based, at least in part, on the information provided by an agency representative and not an independent source; and (4) that there is no indication that the communications were made for the purposes of committing a crime or a tort, or (5) that Defendant has otherwise waived the privilege.[19]

The Court's specific findings with respect to each of these documents are listed in the chart below.

| Item No. | HUD's Withholding Assertions | Findings of the Court | Decision |
|---|---|---|---|
| 1 | Attorney Client/Work Product | This is an email from agency counsel to an agency representative that reflects legal advice or strategy concerning Plaintiff's return to work from administrative leave while he was under investigation. The advice or strategy was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |
| 2 | Attorney Client/Work Product | This is an email from an agency representative to agency counsel seeking legal review of a draft of official counseling of an agency employee. | Work Product Denied; Attorney-Client Upheld |
| 3 | Attorney Client/Work Product | This is an email from an agency representative to agency counsel seeking legal review of a draft of official counseling of an agency employee. The draft is a later version than that in Item 2 above, and it reflects legal advice offered earlier by agency counsel. | Work Product Denied; Attorney-Client Upheld |

---

[19] In his reply brief, Plaintiff asserted for the first time that Ms. Cottom, the Proposing Official for Plaintiff's adverse personnel action, waived privilege over the draft proposal she authored by testifying about its contents at her deposition. [Dkt. 65 at 13]. Generally, courts will not address arguments raised for the first time in a reply. *See, e.g.*, *Baloch v. Norton*, 517 F. Supp. 2d 345, 348–49 n.2 (D.D.C. 2007) ("If the movant raises arguments for the first time in his reply to the non-movant's opposition, the court [may] ignore those arguments in resolving the motion...."), *aff'd sub nom. Baloch v. Kempthorne*, 550 F.3d 1191 (D.C. Cir. 2008). Moreover, Plaintiff's extremely scanty treatment of this argument does not detail the scope of the alleged waiver of privilege. Indeed, it is not even clear to which precise document the purported waiver applies. For these reasons, Plaintiff's assertion that attorney-client privilege was waived is denied.

| | | | |
|---|---|---|---|
| 4 | Attorney Client/Work Product | This is an email from an agency representative to agency counsel seeking legal review of a draft of official counseling of an agency employee.  The draft is a later version than that in Item 2 above, and it reflects legal advice offered earlier by agency counsel. | Work Product Denied; Attorney-Client Upheld |
| 5 | Work Product | This is a string of two emails, one at 5:40 p.m. on June 29, 2010, between two agency counsel, the second at 6:55 p.m. forwarding the first email to other agency representatives.  The 6:55 p.m. email has no content; it merely transmits the 5:40 p.m. email.  The 5:40 p.m. email describes the content of a telephone call between agency counsel and Plaintiff's counsel.  Defendant asserts only work product protection with respect to this email.   As discussed previously, that claim is denied for failure to demonstrate that this document, or any other document in this case, was created in anticipation of litigation.  As to the 6:55 p.m. email, Defendant's assertion of attorney-client privilege is denied because the email does not reflect a request for, or the provision of, legal advice.   Rather, it merely recites what was said during a telephone call between agency counsel and Plaintiff's counsel.   Accordingly, Defendant shall produce both emails in full. | Denied in Full |
| 6 | Attorney Client/Work Product | | |
| 7 | Attorney Client/Work Product | This is a string of four emails.  Two are identical to Items 5 and 6, and the Court's determination with respect to them is the same as described above.   Defendant's assertion of attorney-client privilege as to the other two emails in the chain—a June 30, 2010 email at 8:01 a.m. and a one-word response email on June 30, 2010 at 9:43 a.m.—is denied as neither email concerns the request for, or the provision of, legal advice. | Denied in Full |

| | | | |
|---|---|---|---|
| 8 | Attorney Client/Work Product | Rather, they reflect a request for clarification concerning what Plaintiff's counsel said during a call with agency counsel, and a statement from the agency representative as to what she would do if Plaintiff's counsel called her.  Accordingly, Defendant shall produce all of these emails in full. | |
| 9 | WITHDRAWN as to a portion; Attorney Client as to remainder | This is an email from an agency representative to agency counsel seeking legal advice and strategy concerning multiple personnel matters involving Plaintiff and D.B. | Attorney-Client Upheld |
| 10 | WITHDRAWN as to a portion; Attorney Client/Work Product as to remainder | The redactions at issue reflect communications in two strings of emails from Defendant's counsel to an agency representative regarding Plaintiff's compliance with ethics requirements.  However, the non-redacted material in those email strings—produced to Plaintiff in discovery—discloses apparently all of the information provided by agency representatives to Defendant's counsel on which the advice in the redacted communications is based.  Certainly, Defendant has not met its burden to demonstrate otherwise.  Accordingly, even assuming that the redacted material was at some point protected by attorney-client privilege, that privilege has been waived.  Defendant shall produce these two strings of emails in full. | Denied in Full |
| 11 | Attorney Client/Work Product | | |

| 12 | Attorney Client/Work Product | The redactions at issue concern a four-paragraph email on August 5, 2010 at 2:36 p.m. between two non-attorney agency representatives. While the paragraphs reflect a conversation with agency counsel, only the third paragraph—beginning, "She also advised . . ."—reflects legal advice and strategy regarding the scope and timing of the agency's investigation of Plaintiff, which was based, at least in part, on information provided by an agency representative and not an independent source. The first, second, and fourth paragraphs do not do so. The first and fourth paragraphs are devoid of any privileged content. The second paragraph conveys information from a non-agency source. Accordingly, Defendant shall produce a new version of this email with only the third paragraph redacted. | Work Product Denied; Attorney-Client Upheld in Part and Denied in Part |
| --- | --- | --- | --- |
| 13 | WITHDRAWN as to portions; Attorney Client as to remainder | This is an email from an agency representative to agency counsel seeking legal advice and strategy with respect to responding to an email from counsel for D.B. | Attorney-Client Upheld |
| 14 | WITHDRAWN as to email; Attorney Client/Work Product for attached letter | This is a partially-redacted draft letter to D.B. and her attorney concerning her leave status. The draft is attached to an email from an agency representative requesting agency counsel's review and guidance concerning the content of the draft letter. | Work Product Denied; Attorney-Client Upheld |
| 15 | Attorney Client/Work Product | These are two emails from agency counsel to agency representatives that contain legal advice and strategy concerning Plaintiff's return to work from administrative leave while he was under investigation. The emails also reflect information collected by agency counsel from other agency representatives needed to provide that advice. | Work Product Denied; Attorney-Client Upheld |
| 16 | Attorney Client/Work Product | | |

| 17 | Attorney Client/Work Product | This is an email from an agency representative to agency counsel seeking legal advice and strategy with respect to concerning Plaintiff's return to work from administrative leave while he was under investigation. | Work Product Denied; Attorney-Client Upheld |
|---|---|---|---|
| 18 | Attorney Client/Work Product | Defendant's claim of attorney-client privilege is upheld. This is an email from agency counsel to agency representatives responding to a request for legal advice and strategy with respect to whether an adverse action should be taken against Plaintiff based on information that may be learned concerning ongoing investigations of his conduct, and that directs an agency representative to collect information needed by counsel to provide that advice and strategy. | Work Product Denied; Attorney-Client Upheld |
| 19 | Attorney Client | This is an email from an agency representative to agency counsel providing information requested by counsel for purposes of providing legal advice and strategy with respect to responding to Plaintiff's counsel's request to extend Plaintiff's administrative leave. | Attorney-Client Upheld |
| 20 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives, the first two paragraphs of which contain legal advice and strategy concerning whether to extend Plaintiff's administrative leave, and direct an agency representative to collect information needed by counsel to provide advice and strategy. Those paragraphs also reflect information collected by agency counsel from other agency representatives needed by counsel to providing that advice. The last paragraph—beginning "Can you. . ."—does not contain any legal advice or strategy, however. Rather, it merely requests the agency representative to convey the final decision regarding Plaintiff's administrative leave to agency counsel so that he can convey that information to Plaintiff's attorney. Accordingly, Defendant shall produce a new version of this email with the last paragraph unredacted. | Work Product Denied; Attorney-Client Upheld in Part and Denied in Part |

| 21 | Attorney Client/Work Product | This is an email from agency counsel to an agency representative that responds to a request for legal advice and strategy regarding Plaintiff counsel's request to extend Plaintiff's administrative leave. The email also reflects information collected by agency counsel from other agency representatives needed to provide that advice. | Work Product Denied; Attorney-Client Upheld |
| --- | --- | --- | --- |
| 22 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives that responds to requests for legal advice and strategy concerning extending Plaintiff's administrative leave and the timing of a possible adverse action based on information learned concerning ongoing investigations of his conduct. The email also reflects information collected by agency counsel from other agency representatives needed to provide that advice. | Work Product Denied; Attorney-Client Upheld |
| 23 | Attorney Client/Work Product | This email contains neither a request for, nor the provision of, legal advice. Rather, it includes only a statement from an agency representative reflecting a decision that she and another agency representative made concerning Plaintiff counsel's request to extend Plaintiff's administrative leave. Accordingly, Defendant shall produce an unredacted version of this email. | Denied in Full |
| 24 | Attorney Client | This is an email from an agency representative to agency counsel and other agency representatives seeking legal advice and strategy with respect to extending Plaintiff's administrative leave based on the status of ongoing investigations of his conduct. | Attorney-Client Upheld |

| | | | |
|---|---|---|---|
| 25 | WITHDRAWN as to portions; Attorney Client as to remainder | This is a two-paragraph email from an agency representative to agency counsel. The second paragraph is attorney-client privileged as it seeks legal advice concerning extending Plaintiff's administrative leave. The first paragraph, however—beginning "Peter, thanks. . ."—neither seeks nor provides legal advice, or any information related thereto. Rather, it merely reflects which agency personnel will be on leave that week. Accordingly, Defendant shall produce a new version of this email with the first paragraph unredacted. | Attorney-Client Upheld in Part and Denied in Part |
| 26 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives that contains legal advice regarding extending Plaintiff's administrative leave. The advice was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |
| 27 | Attorney Client/Work Product | This is an email from an agency representative to other agency representatives and agency counsel reflecting legal advice from counsel with respect to extending Plaintiff's administrative leave as well as information provided by agency representatives on which the advice was based. | Work Product Denied; Attorney-Client Upheld |
| 28 | Attorney Client | This is a string of emails on September 29, 2010, three of which Defendant claims are privileged. None reflect a request for, or the provision of, legal advice. Rather, they merely reflect confirmation of whether a decision had been made by an agency component to permit Plaintiff to work from home. Accordingly, Defendant shall produce the entire email string unredacted. | Denied in Full |
| 29 | Attorney Client/Work Product | | |
| 30 | Attorney Client/Work Product | | |

| | | | |
|---|---|---|---|
| 31 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives that contains legal advice and strategy regarding possible discipline or other actions regarding Plaintiff. The advice was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |
| 32 | Attorney Client/Work Product | This email from agency counsel to agency representatives reflects neither a request for, nor the provision of, legal advice. Indeed, just the opposite: it contains nothing more than a statement from an agency counsel that he was not in a position to offer any advice because he had not received the Office of Inspector General (OIG) report concerning Plaintiff.  Accordingly, Defendant shall produce an unredacted version of this email. | Denied in Full |
| 33 | Attorney Client/Work Product | This is an email from an agency representative to agency counsel and other representatives.  It reflects neither a request for, nor the provision of, legal advice. Rather, it reflects a directive from the agency's OIG that the OIG report concerning Plaintiff not be released to anyone, including apparently agency counsel.  Accordingly, Defendant shall produce an unredacted version of this email. | Denied in Full |
| 34 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives that contains legal advice regarding possible discipline or other actions against Plaintiff.  The advice was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |
| 44 | Attorney Client/Work Product | This is a redacted email from an agency representative to her supervisor regarding the draft of Plaintiff's notice of proposed removal. The redacted information in the transmittal email reflects legal advice from agency counsel and modifications made to the notice based on the advice of counsel. The advice was based, at least in part, on | Work Product Denied; Attorney-Client Upheld |

| | | information provided by an agency representative and not an independent source. | |
|---|---|---|---|
| 45 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives that contains legal advice following review of a written reply from Plaintiff's counsel regarding his potential discipline. | Work Product Denied; Attorney-Client Upheld |
| 46 | Attorney Client | This is an email from an agency representative to agency counsel and other agency representatives both reflecting and seek legal advice with respect to the legal sufficiency of Plaintiff's proposed removal proceedings. | Attorney-Client Upheld |
| 47 | WITHDRAWN as to last sentence; Attorney Client/Work Product as to remainder | This is an email from agency counsel to agency representatives that contains legal advice regarding the legal sufficiency of Plaintiff's proposed removal proceedings. The advice was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |
| 48 | WITHDRAWN as to last sentence; Attorney Client/Work Product as to remainder | This is an email from an agency representative to agency counsel and other agency representatives both reflecting and seeking legal advice with respect to the legal sufficiency of removal proceedings regarding Plaintiff. | Work Product Denied; Attorney-Client Upheld |
| 49 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives that contains legal advice regarding the legal sufficiency of the proposed removal proceedings regarding Plaintiff. The advice was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |

| 50 | WITHDRAWN as to last 2 paragraphs; Attorney Client/Work Product as to remainder | This is an email from an agency representative to agency counsel and other agency representatives both reflecting and seeking legal advice with respect to the legal sufficiency of removal proceedings regarding Plaintiff. | Work Product Denied; Attorney-Client Upheld |
|---|---|---|---|
| 59 | Attorney Client/Work Product | The redactions at issue concern a two-paragraph email sent from an agency representative to agency counsel. The first paragraph is privileged as it reflects the request for legal advice regarding a draft of a proposed removal of an agency employee. The second paragraph—beginning, "I'm teleworking today . . .—is devoid of any privilege content. Accordingly, Defendant shall produce a new version of this email with only the first paragraph redacted. | Work Product Denied; Attorney-Client Upheld in Part and Denied in Part |
| 60 | Attorney Client/Work Product | The redactions at issue concern a one-paragraph email, with bullet points, sent from agency counsel to an agency representative. Although the email contains the counsel's edits to a draft of a proposed removal of an agency employee, the edits are merely typographical and without privileged content. Indeed, counsel states in the email, that "these comments do not affect the legal sufficiency of the proposal." Accordingly, Defendant shall produce an unredacted version of this email. | Denied in Full |
| 63 | WITHDRAWN as to first sentence; Attorney Client/Work Product as to remainder | The redactions at issue concern a two-paragraph email sent by agency counsel to an agency representative. Only the last sentence of the second paragraph—beginning "Let's . . ."—is protected by the attorney client privilege as it contains a legal recommendation concerning a possible settlement with D.B. The remainder of the email contains information from a non-agency source— D.B.'s attorney—and reflects neither a request for, nor the provision of, legal advice. Accordingly, Defendant shall produce a new version of this email with only the last sentence of the second paragraph redacted. | Work Product Denied; Attorney-Client Upheld in Part and Denied in Part |

| 64 | WITHDRAWN as to portions; Attorney Client/Work Product as to remainder | This is a redacted email from agency counsel to an agency representative that contains a legal recommendation regarding a possible settlement with D.B. | Work Product Denied; Attorney-Client Upheld |
|---|---|---|---|
| 71 | Attorney Client/Work Product | This is an email from an agency representative to agency counsel and other agency representatives both seeking and reflecting legal advice regarding a proposed modification of the proposal to remove D.B. in light of counsel's comments on a draft of the proposed removal. | Work Product Denied; Attorney-Client Upheld |
| 72 | Attorney Client/Work Product | This is an email from agency counsel to an agency representative responding to request for legal advice regarding a proposed modification of the proposal to remove D.B. The advice was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |
| 73 | Attorney Client/Work Product | This is a redacted email from an agency representative to the deciding agency official responsible for D.B.'s removal. The email transmitted the final version of the notice of proposed removal to the deciding agency official. The redacted information in the transmittal email reflects legal advice from agency counsel and modifications made to the notice based on the advice of counsel. The advice was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |
| 74 | Attorney Client/Work Product | This is an email sent by agency counsel to multiple agency representatives. It reflects neither a request for, nor the provision of, legal advice. Rather, it merely informs agency representatives that a settlement in principle has been reached with Plaintiff. Accordingly, Defendant shall produce an unredacted version of this email. | Denied in Full |

| 75 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives that contains legal advice and strategy concerning the terms of a settlement agreement regarding Plaintiff's disciplinary action. The advice was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |
|---|---|---|---|
| 77 | Attorney Client/Work Product | This is an email from agency counsel to an agency representative seeking information needed by counsel to provide legal advice concerning terms of settlement agreement with Plaintiff. | Work Product Denied; Attorney-Client Upheld |
| 78 | WITHDRAWN as to portion; Attorney Client/Work Product as to remainder | This is an email sent between non-attorney agency personnel. The email includes three redactions. Two redactions—one in the second paragraph and one in the fifth paragraph—are of names of agency employees who were the subject of adverse actions that have no relevance to this litigation.  To protect the privacy of those individuals, the redaction of their names shall be permitted.  As for the redaction in the fourth paragraph of the email that pertains to Plaintiff's case—beginning "they have . . ."—Defendant's claim of attorney-client privilege is denied.  The redacted language reflects neither a request for, nor the provision of, legal advice.  Rather, it merely reflects a communication with agency counsel informing agency representatives that a settlement had been reached with Plaintiff.  Accordingly, Defendant shall produce a version of this email with only the two employees' names redacted. | Work Product Denied; Attorney-Client Upheld in Part and Denied in Part |
| 79 | Attorney Client/Work Product | This is a string of three emails sent on December 8, 2011.  Defendant's claim of privilege as to the third email sent at 9:17 a.m. is denied as it is devoid of any privileged content.  Defendant's claim of privilege as to the emails sent at 9:28 a.m. and 1:02 p.m. by agency counsel to other agency counsel and agency representatives is upheld as both emails reflect legal advice and strategy concerning the terms of a settlement with | Work Product Denied; Attorney-Client Upheld in Part and Denied in Part |

| | | | |
|---|---|---|---|
| 80 | Attorney Client/Work Product | Plaintiff.  The advice was based, at least in part, on information provided by an agency representative and not an independent source.  Accordingly, Defendant shall produce a new version of this email with only the emails sent at 9:28 a.m. and 1:02 p.m. redacted. | |
| 81 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives that contains legal advice and strategy concerning communications with Plaintiff. | Work Product Denied; Attorney-Client Upheld |
| 82 | Attorney Client/Work Product | This is an email from an agency representative to agency counsel that reflects legal advice and strategy concerning communications with Plaintiff. | Work Product Denied; Attorney-Client Upheld |
| 83 | Attorney Client/Work Product | This is an email from agency counsel to an agency representative that contains legal advice and strategy concerning how to respond to a question from Plaintiff concerning his retirement.  The advice was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |
| 84 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives that contains legal advice and strategy concerning communications with Plaintiff regarding his retirement.  The advice was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |
| 85 | WITHDRAWN as to email; Attorney Client/Work Product as to remainder | This is an email from agency counsel to other agency counsel and representatives that both reflects and seeks legal advice concerning a draft settlement agreement, prepared by counsel, regarding Plaintiff. | Work Product Denied; Attorney-Client Upheld |

| | | | |
|---|---|---|---|
| 86 | WITHDRAWN as to a portion; Attorney Client/Work Product as to remainder | This is an email from agency counsel to agency representatives that contains legal advice and strategy concerning ongoing settlement negotiations with Plaintiff and related retirement and disciplinary issues. The advice was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |
| 87 | Attorney Client/Work Product | This is an email from an agency representative to agency counsel that requests legal advice and strategy concerning ongoing settlement negotiations with Plaintiff and related disciplinary issues. | Work Product Denied; Attorney-Client Upheld |
| 88 | Attorney Client/Work Product | This is an email from an agency representative to agency counsel that responds to a request for legal advice and strategy concerning ongoing settlement negotiations with Plaintiff and related disciplinary issues. | Work Product Denied; Attorney-Client Upheld |
| 91 | Attorney Client/Work Product | This is an email from agency counsel to an agency representative reflecting legal advice concerning a personnel matter irrelevant to Plaintiff's case. Accordingly, the content of the email is properly redacted. | Work Product Denied; Attorney-Client Upheld |
| 92 | WITHDRAWN as to portions; Attorney Client/Work Product as to remainder | This is an email from agency counsel to agency representatives. Its first two paragraphs are properly redacted as their content reflect legal advice concerning a personnel matter irrelevant to Plaintiff's case. The third paragraph—beginning "Finally. . . "—reflects legal advice and strategy concerning ongoing settlement negotiations with D.B. Accordingly, it is properly withheld under the attorney-client privilege. | Work Product Denied; Attorney-Client Upheld |
| 93 | Attorney Client/Work Product | This is an email from agency counsel to an agency representative that contains a request for information pertaining to legal advice and strategy concerning personnel matters involving Plaintiff. | Work Product Denied; Attorney-Client Upheld |

| 94 | Attorney Client/Work Product | This is an email from an agency representative to agency counsel providing information at the direction of counsel needed by counsel to provide legal advice and strategy with respect to personnel matters involving Plaintiff. | Work Product Denied; Attorney-Client Upheld |
|---|---|---|---|
| 95 | Attorney Client/Work Product | This is an email from an agency representative to agency counsel. Its first two paragraphs are properly redacted as their content reflects information requested by counsel concerning a personnel matter irrelevant to Plaintiff's case.  The third paragraph—beginning "With regard . . ." — contains an agency representative's response to agency counsel with information sought by the counsel for purposes of developing legal advice and strategy concerning ongoing settlement negotiations with D.B.  Accordingly, it is properly withheld under the attorney-client privilege. | Work Product Denied; Attorney-Client Upheld |
| 96 | Attorney Client/Work Product | This is an email from agency counsel to an agency representative reflecting legal advice concerning a personnel matter irrelevant to Plaintiff's case.  Accordingly, the content of the email is properly redacted. | Work Product Denied; Attorney-Client Upheld |
| 97 | Attorney Client/Work Product | This is an email from agency counsel to an agency representative reflecting legal advice concerning a personnel matter irrelevant to Plaintiff's case.  Accordingly, the content of the email is properly redacted. | Work Product Denied; Attorney-Client Upheld |
| 101 | Attorney Client/Work Product | This is an email from agency counsel to an agency representative reflecting legal advice concerning ongoing settlement negotiations with respect to D.B.  The advice was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |
| 105 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives that contains the mental impressions of counsel and seeks information and gives direction concerning the agency's responses to discovery requests served in a matter in actual litigation, D.B.'s MSPB appeal. | Work Product Upheld; Attorney-Client Upheld |

| | | | |
|---|---|---|---|
| 106 | Attorney Client/Work Product | This is an email sent by agency counsel to multiple agency representatives.  It reflects neither a request for, nor the provision of, legal advice.  Rather, it merely informs agency representatives of the content of a telephone call from Plaintiff's counsel requesting where Plaintiff should report when he returned to work.  Accordingly, Defendant shall produce an unredacted version of this email. | Denied in Full |
| 107 | Attorney Client/Work Product | This is an email sent by an agency representative to agency counsel and other agency representatives.  It reflects neither a request for, nor the provision of, legal advice.  Rather, it merely responds to agency counsel's question concerning where Plaintiff should report when he returned to work.  Accordingly, Defendant shall produce an unredacted version of this email. | Denied in Full |
| 108 | Attorney Client/Work Product | This is an email sent by agency counsel to multiple agency representatives.  It reflects neither a request for, nor the provision of, legal advice.  Rather, it merely requests where Plaintiff should report when he returned to work.  Accordingly, Defendant shall produce an unredacted version of this email. | Denied in Full |
| 109 | Attorney Client/Work Product | This is an email sent by an agency representative to agency counsel and other agency representatives.  It reflects neither a request for, nor the provision of, legal advice. Rather, it requests clarification from Office of the Chief Human Capital Officer ("OCHCO") / ELR regarding a fact concerning the final personnel decision with respect to Plaintiff.  Accordingly, Defendant shall produce an unredacted version of this email. | Denied in Full |

| | | | |
|---|---|---|---|
| 110 | Attorney Client/Work Product | This is an email sent by an agency representative in HUD-ELR to agency counsel and other agency representatives. It reflects neither a request for, nor the provision of, legal advice. Rather, it responds to the request for clarification in item 109 regarding a fact concerning the final personnel decision with respect to Plaintiff. Accordingly, Defendant shall produce an unredacted version of this email. | Denied in Full |
| 111 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives that contains the mental impressions of counsel and seeks information and gives direction concerning the agency's responses to discovery requests served in a matter in actual litigation, D.B.'s MSPB appeal. | Work Product Upheld; Attorney-Client Upheld |
| 112 | Attorney Client/Work Product | This is an email from an agency representative to agency counsel that provides counsel with the information sought by counsel to respond to a discovery request served in matter in actual litigation, D.T.'s administrative EEO case. | Work Product Upheld; Attorney-Client Upheld |
| 113 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives that contains the mental impressions of counsel and seeks information needed for the agency's responses to discovery requests served in matter in actual litigation, D.T.'s administrative EEO case. | Work Product Upheld; Attorney-Client Upheld |
| 114 | Attorney Client/Work Product | This is an email from an agency representative to agency counsel that provides counsel with the information sought by counsel to respond to a discovery request served in matter in actual litigation, D.T.'s administrative EEO case. | Work Product Upheld; Attorney-Client Upheld |
| 116 | Attorney Client/Work Product | This is an email from agency counsel to agency representatives that contains the mental impressions of counsel and seeks information and gives direction concerning the agency's responses to discovery requests served in a matter in actual litigation, D.B.'s MSPB appeal. | Work Product Upheld; Attorney-Client Upheld |

| | | | |
|---|---|---|---|
| 123 | Attorney Client/Work Product | This is an HUD-ELR monthly report from January 2011. All entries on the report but one have no relevance to this case and are properly redacted. The only entry that is relevant—on page 9 of the report— contains a single line that reflects legal advice provided by agency counsel with respect to Plaintiff's draft proposed removal. Accordingly, the agency's redactions are proper. | Work Product Denied; Attorney-Client Upheld |
| 124 | Attorney Client/Work Product | This is an HUD-ELR weekly case report from January 14, 2011. All entries on the report but one have no relevance to this case and are properly redacted. The only entry that is relevant—on page 1 of the report— contains a two redactions which reflect legal advice provided by agency counsel with respect to Plaintiff's draft proposed removal. Accordingly, the agency's redactions are proper. | Work Product Denied; Attorney-Client Upheld |
| 125 | Attorney Client/Work Product | This is an HUD-ELR weekly case report from January 28, 2011. All entries on the report but one have no relevance to this case and are properly redacted. The only entry that is relevant—on page 1 of the report— contains a two redactions which reflect legal advice provided by agency counsel with respect to Plaintiff's draft proposed removal. Accordingly, the agency's redactions are proper. | Work Product Denied; Attorney-Client Upheld |
| 126 | Attorney Client/Work Product | This is between agency representatives that reflects legal advice and strategy concerning D.B.'s adverse action. The advice was based, at least in part, on information provided by an agency representative and not an independent source. | Work Product Denied; Attorney-Client Upheld |

## IV.   CONCLUSION

For the reasons stated herein, the Court will **GRANT IN PART** and **DENY IN PART** Plaintiff's motion to compel [Dkt. 53], and Defendant will be ordered to produce in full items 5, 6, 7, 8, 10, 11, 23, 28, 29, 30, 32, 33, 60, 62, 74, 76, 89, 106, 107, 108, 109, and 110 from

the second revised privilege log, and items 12, 20, 25, 59, 63, 78, 79, and 80 in redacted form as described in this Memorandum Opinion. A separate Order consistent with this Opinion will issue this same day.

Date: March 30, 2018

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE